UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| RONALD V. PRINCE, <br><br> Plaintiff <br><br> v. <br><br> CAROLYN W. COLVIN, Acting Commissioner of Social Security, <br><br> Defendant. | Case No.  3-12-CV-05609-LB <br><br> **ORDER (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING DEFENDAT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND (3) REMANDING FOR FURTHER CONSIDERATION** <br><br> [Re ECF Nos. 25, 28] |

## INTRODUCTION

Plaintiff Ronald Prince moves for summary judgment, seeking judicial review of a final decision by defendant Carolyn W. Colvin, the Acting Commissioner of Social Security Administration (the "Commissioner"), denying him Social Security Income ("SSI") disability benefits for his claimed disability of depression, HIV, vomiting/diarrhea, bronchial infections, and bipolar disorder.  Pl.'s Mot., ECF No. 25;[1] Administrative Record ("AR") 1.  The Administrative Law Judge determined that Mr. Prince could not perform his past relevant work but that he was capable of performing other jobs that existed in significant numbers in the national economy.  AR 36-37.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 5, 16.

---

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document.

United States District Court
Northern District of California

For the reasons stated below, the court **GRANTS** Mr. Prince's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case for further reconsideration.

**STATEMENT**

## I.   PROCEDURAL HISTORY

Mr. Prince, now 45 years old, filed a Title II application for a period of disability and disability insurance benefits on September 24, 2008.  AR 80, 27.  The Commissioner denied his application both initially and upon reconsideration.  AR 92-95, 189.  On January 28, 2010, Mr. Prince timely requested a hearing before an ALJ.  AR 27.  An ALJ conducted a hearing on April 20, 2011 in Oakland, California.  AR 45.  Mr. Prince appeared with his attorney, Ms. Vyonne Troya, and testified at the hearing along with vocational expert Jo Ann Yoshioka (the "VE").  AR 27, 45.

The ALJ issued a decision on June 17, 2011 and found that Mr. Prince was not disabled because he was capable of performing other jobs that existed in significant numbers in the national economy.  AR 36-37.

Mr. Prince timely requested that the Appeals Council review the ALJ's decision.  AR 21-22. The Appeals Council denied the request for review on September 5, 2012.  AR 1.  That denial rendered the ALJ's June 17, 2011 decision the Commissioner's final decision.  AR 1.

Mr. Prince filed a complaint for judicial review under 42 U.S.C. § 405(g).  Compl., ECF No. 1. Mr. Prince and the Commissioner both now move for summary judgment.  Pl.'s Mot., ECF No. 25; Comm'r's Opp'n and Cross-mot., ECF No. 28.

## II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) the vocational expert's testimony, (C) Mr. Prince's testimony, and (D) the ALJ's findings.

### A.   Medical Evidence

#### 1.   *Dr. Ahmed El-Sokkary on 05/08/09*

On May 8, 2009, Dr. Ahmed El-Sokkary, a clinical psychologist, examined Mr. Prince.  AR 766-69.  Mr. Prince complained of "high blood pressure, HIV, arthritis, COPD, [m]aniac depression, and back injury."  AR 766.  In terms of Mr. Prince's "present level of functioning,"

2

United States District Court
Northern District of California

1   Dr. El-Sokkary reported that Mr. Prince "is able to care for hygiene, grooming, daily living

2   activities, including light cooking and cleaning." AR 766. Dr. El-Sokkary also described his

3   education, medical history with HIV, and family history with an abusive father. AR 766.

4       Dr. El-Sokkary administered several tests: 1) WMS/WAIS-III, 2) Bender Gestalt-II, and 3)

5   Trails A & B. AR 766. As for the WAIS-III, Dr. El-Sokkary opined that Mr. Prince's results

6   were in the Low Average range, except for an Average range for his Verbal Comprehension

7   Index. AR 768. Mr. Prince obtained the following scores: Full Scale IQ of 85, Verbal Scale of

8   88, Performance score of 84, Perceptual Organization Index of 84, and Verbal Comprehension

9   Index of 94. AR 768.

10      Mr. Prince's other examination showed a normal or average range. AR 768. With respect to

11  Trails A & B, Dr. El-Sokkary indicated that Mr. Prince had "normal psychomotor speed, visual

12  scanning, and mental flexibility." AR 768. On the WMS-III examination, Mr. Prince's

13  "immediate and delayed visual memory results were all within normal limits." AR 768. Lastly,

14  on the Bender-Gestalt II test, Mr. Prince's results "suggested normal visual motor integration

15  abilities that are within the average range." AR 768.

16      In the Medical Source Statement, Dr. El-Sokkary further elaborated on Mr. Prince's limitation.

17  AR 768-69. Dr. El-Sokkary stated,

18
19          Based solely on the current evaluation and from a strictly cognitive and emotional
            standpoint, claimant demonstrates a capacity to understand, remember, and perform
20          simple tasks. Claimant was able to maintain a sufficient level of concentration,
            persistence, and pace to do basic work in an environment that health condition
21          would allow. Claimant was cooperative throughout the evaluation and was capable
            of adequately communicating and therefore would be able to appropriately interact
22          with supervisors and co-workers at this time. However, given his overall outlook,
            reported psychiatric history, and self conception he is at risk for further emotional
23          dysfunction in response to elevated distress and the lack of prescription medication.

24  AR 768-69.

25      Ultimately, Dr. El-Sokkary diagnosed Mr. Prince with the following conditions: mood

26  disorder, NOS; R/O psychotic disorder, NOS; back injuries; HIV; high blood pressure;

27  arthritis; and COPD with a GAF 60. AR 768.

28          *2. APEB Wellness Center from 01/31/08 – 04/05/11*

United States District Court
Northern District of California

3

1    Mr. Prince has asymptomatic HIV infection.  AR 824.  Since June 2006, Mr. Prince has

2    received HIV treatment from the AIDS Project East Bay Wellness Center in Oakland.  AR 964.

3    He has received care from doctors, physician's assistant, and nurse practitioners at the Center.  AR

4    799-860.  The court has included summaries of the relevant opinions below.

5    *i. Dr. Beatrice Morris*

6    On October 21, 2008, Dr. Beatrice Morris reported that Mr. Prince felt "fairly well today."

7    AR 832.  Despite feeling well on the day of the appointment, Mr. Prince complained of having

8    pain while sleeping.  AR 832. Dr. Morris also noted that Mr. Prince injured his shoulder while

9    weight lifting in 1992.  AR 832.  Due to these conditions, Dr. Morris noted that Mr. Prince takes

10    Ativan to address his sleeping problem and vicodin for his right shoulder pain.  AR 832.

11    Ultimately, Dr. Morris assessed Mr. Prince with the following conditions: 1) asymptomatic HIV

12    infection; 2) chronic right shoulder pain; and 4) elevated LFT.  AR 832.

13    About a month later, Dr. Morris reported a similar assessment.  AR 831.  He noted that Mr.

14    Prince is HIV asymptomatic and is doing well on Atripia.  AR 831.  Dr. Morris also noted that Mr.

15    Prince has a sleep disorder and recurrent right shoulder pain.  AR 831.  Despite his right shoulder

16    pain, Mr. Prince, Dr. Morris opined, continues to work regularly at various odd jobs.  AR 831.

17    *ii. Nurse Practitioner Euredis Chipendo*

18    On February 3, 2009, Ms. Euredis Chipendo, a nurse practitioner at APEB Wellness Center,

19    reported that Mr. Prince's cough, which has persisted for a week is keeping him awake at night.

20    AR 828.  With respect to Mr. Prince's HIV condition, she indicated that Mr. Prince's "[v]iral load

21    remains undetectable."  AR 828.

22    About five months later, Ms. Chipendo noted the following in Mr. Prince's treatment record:

23    "Bipolar disease per pt report: Medical records from Contra Costa County requested."  AR 809.

24    She also reported that Mr. Prince's chronic shoulder pain was stable with vicodin.  AR 809.

25    *iii. Physician Assistant Nais Raulet*

26    On April 5, 2011, Mr. Prince told Ms. Nais Raulet, the physician's assistant, that he has

27    unpredictable diarrhea three times per day.  AR 962.  Ms. Raulet also reported that Mr. Prince had

28    not received psychiatric treatment.  AR 962.  In the subjective complaint section, Ms. Raulet

United States District Court
Northern District of California

4

reported the following:

> Ong[o]ing fatigue since approx. 2004.  Naps 1-1 ½ hours q am and q afternoon without feeling completely refreshed.  No TOH or drugs.  Diarrhea tid is unpredictable and explosive at times.  Not yet gone to Sausal Creek to get psychiatric evaluation.  They have no appts available.  [He] was told to drop in on Monday at 8am to wait for a possible slot.  Still hestitates to go in due to previous hx  [meaning, history] of bad experience with psychiatrist who 51/50'd him years ago.  Is not currently suicidal or homicidal.  [He] [c]ontinues to isolate, to have issues with anger management, to avoid going out, to suffer anhedonia.  Has difficulty interacting and managing conflict with others, which prevents him from holding down jobs.  Difficulty with coworkers and supervisors.  Dx'd bipolar since at least 2006 and off meds since not covered on adap and last regimen caused side effects.  Respiradol caused increased aggressiveness.  No psychiatrist evaluation and treatment since jail 2007.

AR 962.  In Ms. Raulet's objective evaluation section, she observed that Mr. Prince weeps at times.  AR 962.  Ultimately, Ms. Raulet assessed that Mr. Prince has the following conditions: 1) HIV with ongoing fatigue and diarrhea but controlled and adherent with undetectable viral loads; 2) Bipolar; 3) PTSD; and 4) depression.  AR 962.

               *vi.  Dr. Denis Bouvier*

     Dr. Denis Bouvier submitted a letter dated April 14, 2011 to "expand on the notes in Mr. Prince's medical chart."  AR 964.  Dr. Bouvier opined that Mr. Prince regularly experiences debilitating symptoms related to his HIV illness.  AR 964.  More specifically, he experiences anxiety, depression, fatigue, night sweats, respiratory problems, vomiting, and diarrhea.  AR 964.  Due to these symptoms, Dr. Bouvier concluded that Mr. Prince's daily activities are markedly restricted.  AR 964.  In particular, Dr. Bouvier pointed to Mr. Prince's unpredictable diarrhea as a symptom that "interferes with his ability to leave the house and manage outside activities."  AR 964.  Dr. Bouvier also mentioned that Mr. Prince has asthma.  AR 964.

     In addition to asthma and the disabling symptoms Mr. Prince experiences from his HIV illness, Dr. Bouvier also mentioned that Mr. Prince experiences insomnia and side effects due to his HIV medications.  AR 964.  Dr. Bouvier opined that Mr. Prince's "fatigue requires him to take at least two 1-hour unscheduled naps every day."  AR 964.

     In addition to the medication's side effects, Dr. Bouvier also reported that Mr. Prince "suffers from severe bipolar disorder, chronic post traumatic stress disorder, paranoid ideation, social

5

1    withdrawal and chronic anxiety." AR 964. In his letter, Dr. Bouvier explained that "Mr. Prince's

2    depression is evidence by his profound feelings of shame and worthlessness that are likely

3    aggravated by his inability to work, and his HIV diagnosis." AR 964. In addition, he noted that

4    Mr. Prince isolate himself in his apartment and has lost interest in social activities. AR 964. Dr.

5    Bouvier opined that Mr. Prince suffers from sleep disturbance and is often tearful. AR 964-65.

6        Ultimately, Dr. Bouvier concluded that "it would be impossible for Mr. Prince to work at this

7    time or for the foreseeable future." AR 965. He found that Mr. Prince had the following

8    limitations: 1) unable to maintain sustained concentration and focus; 2) difficulty interacting with

9    others; 3) difficulty responding appropriately to supervisors and co-workers on a consistent basis;

10   4) unable to sit for six hours per day due to his chronic shoulder and lower back pain; and 5)

11   unable to stand or walk for more than an hour without a lengthy resting period due to his fatigue

12   and peripheral. AR 965.

13       *3. Dr. Warren Taylor on 03/09/11 & 03/16/11*

14       In March 2011, Dr. Warren Taylor conducted a "Psychological Evaluation" of Mr. Prince. AR

15   945-61. Dr. Taylor's diagnostic impressions included: 1) Bipolar I Disorder, Mixed, Severe with

16   Mood-Congruent Psychotic Fear; 2) Severe and Chronic Postraumatic Disorder; 3) Early Onset of

17   Dysthymic Disorder; 4) Cocaine Dependence with Sustained Full Remission; and 5) "Personality

18   Disorder NOS with Borderline, Paranoid and Antisocial Features with Depressive, Passive-

19   Aggressive and Obsessive-Compulsive Traits." AR 959. His GAF result showed a score of 40,

20   which Dr. Taylor indicated as serious. AR 959.

21       With respect to Mr. Prince's MCMI-III results, Dr. Taylor reported that "Mr. Prince's response

22   style may indicate a broad tendency to magnify the level of experienced illness or a

23   characterological inclination to complain or be self-pitying." AR 956.

24       In the Medical Source and Competency Statement, Dr. Taylor determined that Mr. Prince has

25   many psychological issues, including anger, anxiety, and depression. AR 959-60. Dr. Taylor

26   explained,

27

28       Mr. Prince will be unable to work on a regular and consistent basis with the next
         months based on his severe psychopathology. His explosive outbursts of anger and

6

United States District Court
Northern District of California

1

> aggression are reactivity symptoms of his PTSF, as are his flashbacks, bad
> memories, nightmares, persistent suicidal ideation, irritability, avoidance, and his
> extremely low tolerance for frustration. His PTSD is exacerbated and comorbid
> with his Bipolar I Disorder, Mixed Severe with Mood-Congruent Psychotic
> Features. There is definitely similar symptoms and overlap in both of these
> disorders. His Bipolar Disorder can be seen as cyclic change in his mood and
> energy, with it being a cyclic mixture of both Major Depressive and Manic
> Episodes. His history indicates that he has had a persistent and moderate
> depression since he was a child as seen in persons with a Dysthymic Disorder. His
> history of abusing and being dependent on illegal drugs was a way for him to numb
> himself, basically, self-medicating and has been secondary to his other mental
> health problems.

AR 959-60. Due to Mr. Prince's various psychological issues, Dr. Taylor concluded that he could

not work. AR 959-60.

In examining Mr. Prince, Dr. Taylor determined that Mr. Prince had a marked impairment in

the following work-related activities: 1) carry out short, simple instructions; 2) carry out detailed

(complex) instructions; 3) maintain concentration, attention, and persistence; 3) perform activities

within a schedule and maintain regular attendance; 4) complete a normal workday and workweek

without interruptions from psychologically-based symptoms; and 5) respond appropriately to

changes in work setting. AR 961. In addition, Dr. Taylor found that Mr. Prince had a slight

impairment in understanding and remembering short and simple instructions and a moderate

impairment in understanding and remembering detailed (complex instructions). AR 961. Despite

these findings, Dr. Taylor reported that "Mr. Prince does have the ability to hear, sit, stand, walk,

move about, carry and handle objects, speak and travel independently." AR 961.

### 4. Dr. Phillip Seu on 11/18/08

In November 2008, Dr. Phillip Seu, a surgeon, completed a "comprehensive internal medicine

evaluation." AR 861-63. In examining Dr. Prince's range of motion, Dr. Seu found that Mr.

Prince's shoulder had no tenderness or deformity and that he had a full range of motion. AR 863.

With respect to functional limitations, Dr. Seu did not find any limitations. Specifically, Dr. Seu

reported that Mr. Prince did not have any limitations in the following: the number of hours that he

can stand or walk in an eight-hour workday; the amount of weight that he can carry or lift; ability

to bend, stoop, or crouch (postural limitation); ability to reach, handle, feel, grasp, and finger

(manipulative limitation). AR 864. He also did not find that Mr. Prince required workplace

environmental restrictions or needed an assistive device. AR 864.

7

### 5. *Dr. Foster-Valdez on 06/08/09*

In June 2009, Dr. Jaine Foster-Valdez completed a "Psychiatric Technique Review." Dr. Foster-Valdez indicated that Mr. Prince had the following functional limitation: 1) mild restriction in activities of daily living; 2) moderate difficulties in maintaining social function; and 3) mild difficulties in maintaining concentration, persistence, or pace. AR 791. In the Consultant's Notes section of the report, Dr. Foster-Valdez indicated that Mr. Prince is "viewed as partially credible." AR 793.

In addition to a "Psychiatric Technique Review," Dr. Foster-Valdez also completed a "Mental Residual Function Capacity Assessment." AR 795. In the report, she indicated the following moderate limitations: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to interact appropriately with general public; 4) ability to accept instructions and respond appropriately to criticism from supervisors; 5) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 6) ability to respond appropriately to changes in the work setting. AR 795-96.

In the "Functional Assessment" section, Dr. Foster-Valdez provided the following explanation for her conclusions:

> Clmt [meaning, claimant] is able to meet all of the basic mental demands of competitive, remunerative, unskilled work including:
> Clmt is able to understand, remember and carry out simple instructions.
> Clmt is able to make simple work related decisions, maintain a simple schedule and complete simple tasks on a consistent basis.
> Clmt's ability to respond appropriately to supervisors, coworkers and work situations is limited per his report, he would likely do best in setting w/ limited social contact.
> Clmt is able to deal with changes in a routine work setting.

AR 797.

### B. Vocational Expert's Testimony[2]

Ms. Jo Ann Yoshioka, the VE, identified Mr. Prince's past relevant work as 1) a case aide (DOT # 195.367-010) at SVP 3 with light strength; 2) electrical helper (DOT #829.684-022) at

---

[2] Because the hypotheticals that Mr. Prince's counsel posed to the VE are not at issue, the court did not include the hypotheticals here.

SVP 3 with medium strength[3]; 3) material handler (DOT #929.687-030) at SVP 3 with heavy strength; 4) cable installation (DOT #821.281-010) at SVP 5 with heavy strength; and 5) general laborer (DOT # 922.687-058) at SVP 2 with medium strength.  AR 68.

At the hearing, the ALJ stated that she was going to "find that the cable installation was not done on a full time basis" and inquired "if there were any skills other than that that would be transferable?"  AR 69.  The VE stated that there are three such positions: 1) electronics worker (DOT #726.687-010) at SVP two, light strength, and 1,800 positions regionally and 280,000 nationally; 2) assembler I (light fixtures) (DOT #723.684-014) at SVP 3, light strength, and 2,100 positions regionally and 245,000 nationally; and 3) patcher (DOT #723.687-010) at SVP 2, sedentary strength, and 1,800 positions regionally and 280,000 nationally.  AR 69-70.

The ALJ then posed a hypothetical of an individual with Mr. Prince's age, education, and work background plus the following limitations: 1) ability to complete "medium work"; 2) ability to perform simple tasks consistent with SVP 2, entry-level work; 3) ability to make simple, work-related decisions with few changes in the work place; 4) occasional interaction with coworkers and the public; and 5) avoidance of concentrated exposure to extreme cold, fumes, gases, dusts, odors, and poor ventilation.  AR 70-71.  The VE responded that such a person would not be able to perform Mr. Prince's past relevant work.  AR 71.

Alternatively, the VE found that such an individual would be able to perform the following positions: 1) crate liner (DOT #923.687-078) at SVP 2, medium strength, and 5,200 positions regionally and 770,00 nationally; 2) box bender (DOT #641.687-010) at SVP 1, medium strength, and 1,800 positions regionally and 280,000 nationally; 3) bottle packer (DOT #920.685-026) at SVP 2, light strength, and 3,400 positions regionally and 357,000 nationally; 4) small products assembler (DOT #706.684-022) at SVP 2, light strength, and 1,800 positions regionally and 280,000 nationally; 5) classifier (laundry & related) (DOT #361.687-014) at SVP 2, light strength, and 4,700 positions regionally and 467,000 nationally; 6) patcher (DOT #723.687-010) at SVP 2,

---

[3]  With respect to Mr. Prince's work as an electrical helper, the VE indicated that the type of work and the lifting that he described in his testimony more accurately depicts a position with heavy strength as opposed to the medium strength listed in the DOT for an electrical helper.  AR 69.

United States District Court
Northern District of California

sedentary strength, and 1,800 positions regionally and 280,000 nationally; 7) weight tester (DOT #539.485-018) at SVP 2, sedentary strength, and 4,700 positions regionally and 467,000 nationally; and 8) nut sorter (DOT #521.687-086) at SVP 2, sedentary strength, and 4,700 positions regionally and 467,000 nationally.  AR 71-72.

In a second hypothetical, the ALJ combined the limitations described in the first hypothetical with an additional limitation requiring no reaching overhead with the "right upper extremity." AR 72.  The VE testified that such an individual would be precluded from performing all medium strength positions.  AR 72-73.  Therefore, all the above-mentioned positions would still be available except for the positions requiring medium strength.  AR 72-73.

In the third hypothetical, the ALJ combined the limitations mentioned in the first and second hypothetical with an additional limitation: requiring only occasional interaction with supervisors. AR 73.  The VE found that this would preclude all jobs.  AR 73.

### C.  Mr. Prince's Testimony

With respect to his education, Mr. Prince testified that he had completed high school and some vocational training school.  AR 52.  Mr. Prince further explained that he is able to read, write, and perform simple math.  AR 53.

Mr. Prince then testified regarding his work experience.

In November 2008, he served as an election poll worker for one day.  AR 53, 404.

From March 2008 to May 2008, Mr. Prince served as a full-time trailer attendant for Goodwill Industries.  AR 53, 404.  As a trailer attendant, Mr. Prince "took in all acceptable donations," lifting and carrying items that weighed 40 to 50 lbs.  AR 53.  Mr. Prince testified that he was later terminated from the position because he engaged in an argument with his supervisor and did not report to work the following day.  AR 53.  Mr. Prince stated that the reason provided for terminating him was job abandonment.  AR 53.

Prior to serving as a trailer attendant at Goodwill Industries, Mr. Prince was employed at a Shelter for the Homeless.  AR 54, 404.  At this shelter, Mr. Prince served as a counselor from February 2003 to November 2003.  AR 404.  His responsibilities included "checking on . . . clients" and working with and feeding "dually diagnosed clients" and "homeless clients."  AR 54.

ORDER 12-CV-05609-LB

United States District Court
Northern District of California

In this role, Mr. Prince testified that he was "basically a paid babysitter."  AR 54.  As with his

position at Goodwill Industries, Mr. Prince testified that he was terminated from his position at the

shelter.  AR 54.  Mr. Prince explained that he had a disagreement with his supervisor who

requested that he explain his absences.  AR 54.  Because he refused to explain why he was absent,

the shelter, he testified, terminated him.  AR 54.

Mr. Prince also previously worked at Golden State Recycling where he was responsible for

picking up recyclable items.  AR 55.  He explained that this work was sporadic.

From September 1998 to October 2001, Mr. Prince served as an electrician's aide.  AR 56.  In

that capacity, he would install electrical items, including lighting, underground pipe, junction

boxes, and light switches.  AR 56.  As an electrician aide, the maximum weight he lifted and

carried was between 80-100 pounds.  AR 56.

Some time after he graduated from high school, Mr. Prince also completed cable installation

for a few companies.  AR 57.  Mr. Prince testified that he did "some piece work."  AR 57.

Since 2005, he performed volunteer work related to AIDS outreach with organizations such as

Volunteers of America and La Casa Segura.  AR 59-60.  As a volunteer, Mr. Prince packaged

condoms and safety kits.  AR 59.

After recounting his work history, Mr. Prince testified regarding the conditions that prevented

him from working.  AR 60.  The conditions he listed included neuropathy, chronic shoulder pain,

lower back pain, knee pain, cysts, and uncontrollable bowel movement.  AR 60.  He explained,

> Because my body doesn't react the same any more due to neuropathy symptoms,
> HIV neuropathy symptoms through shoulder aggravations.  I've an old weight
> lifting injury that turned into I guess arthritis cause there's a lot of calcium from
> what I understand, in my shoulders.  I have lower back issues.  My right knee tends
> to swell up and I have both of my ankles are messed up.  I also suffer from
> persistent cysts that may grow in my groin areas or around my tail bone area.  I also
> have, at times, uncontrollable bowel movement.  Which is subject to, well I've
> been subject to accidents.  Once on the job and a couple of times in public while I
> was catching a bus.
> AR 60.

Specifically, Mr. Prince mentioned that his fatigue and pain prevents him from working.

AR 60.  He believes that the HIV medication coupled with being depressed, isolated, and

United States District Court
Northern District of California

overweight causes him to become fatigue and in pain.  AR 60.

With respect to his neuropathy, Mr. Prince described that it starts from the tip of his fingers to his "forearm area" on both sides of his arms.  AR 61.  Moreover, while sitting or lying down, he sometimes experiences neuropathy in both legs to the bottom of his feet.  AR 61.

With respect to his shoulder injury, he takes one Vicodin in the morning and at night in order to relieve his pain.  AR 61.  After taking Vicodin, Mr. Prince testified that he becomes drowsy.  AR 62.  Mr. Prince also has dry skin and persistent dry mouth.  AR 62.  He testified that he is not sure whether the Vicodin causes these symptoms.  AR 62.

With respect to his back pain, he testified that it "gets knotted up," stiff, and "just go[es] out."  AR 62.  The pain depends on what Mr. Prince is doing.  AR 62.  It affects his ability to bend as well as clean.  AR 62.  He testified that he is not receiving any treatment for the lower back pain because he does not have "the insurance to cover that."  AR 63.

After Mr. Prince described his symptoms and physical limitations, the ALJ inquired about Mr. Prince's "depression issues and PTSD issues."  AR 63.  Mr. Prince explained that he isolated himself for the last couple of years.  AR 63.  He expounded that his doctors indicated that he has PTSD due to a history of domestic violence and child abuse.  AR 63.  Mr. Prince also testified that he experiences anxiety and apprehension when he leaves his apartment.  AR 66.  In addressing these issues, he has taken many medications, including Wellbutrin, Depakote, Paxil, Risperdal, and Elavil.  AR 63.

Lastly, Mr. Prince testified regarding his drug problems.  AR 64.  Mr. Prince described how his abusive father introduced him to cocaine at the age of 16.  AR 64.  He has discontinued his drug use but has relapsed twice on a single use in 2007 and 2008.  AR 64.

### D.  ALJ's Findings

Applying the sequential evaluative process, on June 17, 2011, the ALJ held that Mr. Prince was not disabled under § 216(i) and 223(d) of the Social Security Act and therefore was not entitled to disability insurance benefits.  AR 37.

At step one, the ALJ found that Mr. Prince had not engaged in substantial gainful activity since

12

February 1, 1992 through June 17, 2011, the date of the decision.  AR 37.

At step two, the ALJ found that Mr. Prince suffered from the following severe impairments: HIV, bipolar disorder, post-traumatic stress disorder, personality disorder, back and shoulder pain, and polysubstance abuse in remission since 2007.  AR 29.

At step three, the ALJ found that Mr. Prince did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments.  AR 31.

The ALJ then determined Mr. Prince's residual functional capacity ("RFC") in order to assess at steps four and five whether he could perform his past relevant work or any other work considering his age, education, and work experience.  The ALJ found that Mr. Prince had the following RFC: 1) the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; 2) the ability to "sit, stand, walk (each) about six hours in an 8-hour day"; 3) the need to avoid concentrated exposure to extreme cold, fumes, gas, dusts, odors, and poor ventilation; 4) the ability to perform simple tasks consistent with SVP 2; 5) the ability to make simple work-related decisions with few workplace changes; 6) the capacity for occasional interaction with coworkers and the public; and 7) the limitation of no overhead reaching with the right upper extremity.  AR 31-32.

In making this RFC finding, the ALJ considered the symptoms and how consistent they were with the objective medical evidence (based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Rulings 96-4p and 96-7p).  AR 32.  He also considered opinion evidence under 20 C.F.R. §§ 404.1527 and 416.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  AR 32.  The ALJ followed a two-step process, first determining whether there was a medically-determinable physical or mental impairment that reasonably could be expected to produce Mr. Prince's pain and symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent that they limited Mr. Prince's ability to do basic work activities.  AR 32.  For the second part, whenever Mr. Prince's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on the credibility of the statements based on the "entire case record."  AR 32.

United States District Court
Northern District of California

1    The ALJ described Mr. Prince's testimony regarding his daily activities and the effect that his

2    condition had on certain activities.  AR 32.  Specifically, Mr. Prince commented that his disabling

3    condition has affected his ability to use his hands, get along with others, lift, squat, bend, stand,

4    reach, walk, sit, kneel, and climb stairs.  AR 32.  The ALJ opined that Mr. Prince "failed to

5    quantify any such limitations or how those areas are affected. . ."  AR 32.  Even with respect to

6    those areas where Mr. Prince quantified how the limitations affected him, such claims were not

7    consistent with the medical evidence and his own testimony.  AR 32.  Consequently, the ALJ

8    provided "little weight to the affected areas comments."  AR 32.

9    The ALJ then described the "Function Report – Adult – Third Party" of Ms. Leianna Elicker,

10   Mr. Prince's girlfriend.  AR 33.  In her report to the Social Security Administration, Ms. Elicker

11   also commented on how Mr. Prince's condition affected his ability to do certain activities.  *See*

12   AR 32; AR 497.  Similar to Mr. Prince's testimony, the ALJ provided little weight to Ms.

13   Elicker's "affected areas comments" because she failed to quantify the limitations.  AR 32.

14   In addition to the "affected areas comments", the ALJ indicated that Ms. Elicker submitted a

15   statement that she believed Mr. Prince could not work.  AR 33.  With respect to this statement, the

16   ALJ also provided it little weight because "she [meaning, Ms. Elicker] is not an acceptable

17   medical source."  AR 33.

18   After recounting Mr. Prince's testimony and Ms. Elicker's statement to the State Agency, the

19   ALJ found that Mr. Prince's "medically determinable impairments could reasonably be expected

20   to cause the alleged symptoms" but found that his statements "concerning the intensity,

21   persistence and limiting effects of these symptoms are credible to the extent that they are

22   consistent with the above residual functional capacity assessment."  AR 33.  Ultimately, "the ALJ

23   found that Mr. Prince's "subjective complaints are less than fully credible, and the objective

24   evidence does not support the alleged severity of symptoms."  AR 35.

25   In determining Mr. Prince's credibility, the ALJ explained that [t]here is evidence that the

26   claimant was not working for reasons that are not related to the allegedly disabling

27   impairment(s)."  AR 33.  The ALJ pointed to Mr. Prince's answers in an HIV questionnaire,

28   explaining that he tried to obtain work since becoming ill.  AR 33.  Despite his effort, Mr. Prince

14

explained that he was unable to secure work "due to his criminal history and lack of trade value." AR 33. The ALJ found that Mr. Prince's answer was significant. *See* AR 33.

The ALJ determined that the medical evidence also did not support the severity of Mr. Prince's alleged disabling conditions. AR 33-34. Even though Mr. Prince had HIV for 15 years, the ALJ reasoned that he did not receive treatment until September 2008. AR 33. Moreover, the ALJ explained that "[t]here is no opportunistic infection or neoplasia." AR 33. His medical records only showed mild symptoms such as vomiting and diarrhea. AR 33. Rather, Mr. Prince is obese with no significant weight loss or anemia as would be expected of someone with severe symptoms from HIV. AR 33. Despite having a history of asthma, Mr. Prince continues to smoke. AR 34. He also continues to perform his daily chores and help care for his grandson. AR 34.

In determining the RFC, the ALJ then described the relevant medical opinions and explained the weight he provided each medical source. AR 34-35.

First, the ALJ accorded great weight to Dr. Foster-Valdez's opinion. AR 34. Dr. Foster-Valdez reported that Mr. Prince had the following limitations: 1) the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; 2) the ability to sit, stand, and walk for six hours in an 8-hour day; and 3) the need to avoid concentrated exposures to fumes, odors, dusts, gases, and poor ventilation. AR 34. In addition to these limitations, the ALJ "added a limitation of no overhead reaching with the right upper extremity to account for his shoulder problems." AR 34.

Second, the ALJ provided weight to Dr. El-Sokkary's opinion. In finding that Dr. El-Sokkary's opinion deserves weight, the ALJ explained that Dr. El-Sokkary is a specialist in the field of psychology. Moreover, Dr. El-Sokkary has administered many psychological and mental status examinations on Mr. Prince. AR 34.

Third, The ALJ accorded "[g]reat weight" to Dr. Seu's opinion. AR 34 (citation omitted). The ALJ explained that such weight was appropriate because Dr. Seu examined Mr. Prince and "is a board certified surgeon. AR 34 (citation omitted).

Fourth, the ALJ provided the opinion little weight to Nurse Practitioner Euredis Chipendo. In so finding, the ALJ explained that Ms. Chipendo "is not an acceptable medical source." Moreover, the ALJ opined that "her assessment of the claimant's ability to walk and stand 2-4

United States District Court
Northern District of California

1   hours a day is not consistent with the physical findings and opinions" of Dr. Seu.  AR 34.  The

2   ALJ explained that Mr. Prince had "told Dr. Seu that he cleans his home, goes to his

3   appointments, and helps take care of a grandson."  AR 34 (citation omitted).

4       Fifth, the ALJ provided no weight to Dr. Bouvier's opinion.  AR 35.  Dr. Bouvier reported in

5   April 2011 that Mr. Prince was too debilitated by his medical conditions to maintain regular

6   employment.  AR 34.  Specifically, the symptoms relating to his condition: "anxiety, depression,

7   fatigue, insomnia, night sweats, respiratory problems, vomiting, and diarrhea."  AR 35.  These

8   conditions, Dr. Bouvier opined, have markedly affected Mr. Prince's daily activities.  AR 35.  In

9   particular, Mr. Prince's "unpredictable diarrhea" inhibits his ability to leave his home.  AR 35.

10  These symptoms, Dr. Bouvier, noted rendered Mr. Prince "incapable of maintaining sustained

11  concentration and focus, and make it difficult for him to interact with others, and respond

12  appropriately to supervisors and co-workers on a consistent basis."  AR 35.

13      In providing no weight to Dr. Bouvier's opinion, the ALJ explained that the opinion was

14  "inconsistent with the underlying progress notes" from the Center.  AR 35.  The ALJ expounded

15  that Ms. Raulet's April 2011 treatment note indicated that Mr. Prince had "ongoing HIV fatigue

16  and diarrhea that is controlled, viral load remains undetectable, and that he has no psychiatric

17  evaluation since jail 2007."  AR 35 (citation omitted).  In looking at a treatment note dated

18  February 2011, the ALJ found that Mr. Prince had not yet made an appointment with the

19  psychiatric clinic and "is putting it off."  AR 35 (citation omitted).

20      Sixth, the ALJ accorded "no weight" to Dr. Taylor's opinion, because "it is an attorney[-

21  ]referred evaluation that is not supported by the treatment notes of record or by the evaluation that

22  Dr. Taylor himself conducted."  AR 35.

23      Having determined Ms. Prince's RFC, the ALJ proceeded with steps four and five of the

24  sequential evaluative process.

25      At step four, the ALJ found that Mr. Prince was not capable of performing his past relevant

26  work.  AR 35.  As the VE had testified, the ALJ found that the Dictionary of Occupational Titles

27  ("DOT") classifies Mr. Prince's past relevant work as follows: 1) a case aide (DOT #195.367-010)

28  at SVP 3 with light strength; 2) electrical helper (DOT #829.684-022) at SVP 3 with medium and

United States District Court
Northern District of California

16

heavy strength; 3) material handler (DOT #929.687-030) at SVP 3 with heavy strength; 4) cable installation (DOT #821.281-010) at SVP 5 with heavy strength; and 5) general laborer (DOT #922.687-058) at SVP 2 with medium strength.  AR 35-36.

At step five, the ALJ noted that Mr. Prince was a "younger individual" pursuant to 20 C.F.R. §§ 404.1563 and 416.963.  AR 36.  The ALJ also indicated that transferability of skills was not a material issue because the Medical-Vocational Rules supports a finding that Mr. Prince is not disabled regardless if he has a transferable skill.  AR 36.  Pointing to the VE's testimony, the ALJ found that Mr. Prince would be able to perform the following positions: 1) small products assembler (DOT #706.684-022) with 1,800 positions regionally, and 280,000 nationally; 2) recycling center weight tester (DOT #539.485-018) with 4,700 positions regionally, and 467,000 nationally; 3) patcher (DOT #723.687-010) with 1,800 positions regionally, and 280,000 nationally; and 4) nut sorter (DOT #521.687-086) with 4,700 positions regionally and 467,000 nationally.  AR 36-37.

The ALJ thus concluded that the Mr. Prince was not disabled, as defined in the Social Security Act, at any time from February 1, 1992 through the date of the decision.  AR 37.

## ANALYSIS

Mr. Prince challenges the ALJ's decision on two grounds: 1) the ALJ improperly "ignoring" medical opinions; and 2) the ALJ erred by improperly rejecting Mr. Prince's testimony.  Pl.'s Mot., ECF No. 25.

## I. LEGAL STANDARD

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's

17

United States District Court
Northern District of California

1  decision and a different outcome, the court must defer to the ALJ's decision and may not

2  substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir.

3  1999).

4  **A.  Applicable Law: Five Steps to Determine Disability**

5  An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

6  or mental impairment which can be expected to result in death or which has lasted or can be

7  expected to last for a continuous period of not less than twelve months," and (2) the "impairment

8  or impairments are of such severity that he is not only unable to do his previous work but cannot,

9  considering his age, education, and work experience, engage in any other kind of substantial

10  gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

11  The Social Security regulations set out a five-step sequential process for determining whether a

12  claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.

13  The five steps are as follows:

14  **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the

15  claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a

16  substantially gainful activity, then the claimant's case cannot be resolved at step one, and the

17  evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).

18  **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the

19  claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §

20  404.1520(a)(4)(ii).

21  **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments

22  described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the

23  claimant's impairment does not meet or equal one of the impairments listed in the regulations,

24  then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20

25  C.F.R. § 404.1520(a)(4)(iii).

26  **Step Four.**  Considering the claimant's RFC, is the claimant able to do any work that he or

27  she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.

28  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved

United States District Court
Northern District of California

18

at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. §
404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the
claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and
entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other
work, the Commissioner must establish that there are a significant number of jobs in the
national economy that the claimant can do.  There are two ways for the Commissioner to show
other jobs in significant numbers in the national economy: (1) by the testimony of a vocational
expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart
P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts
to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

## II.  APPLICATION

### A.  ALJ Properly Rejected Mr. Prince's Testimony

Mr. Prince contends that the ALJ's finding that he was "less than fully credible" is not
supported by specific, clear, and convincing reasons.  Pl.'s Mot., ECF No. 25 at 13-22.  The court
disagrees because the ALJ provided several reasons for finding that Mr. Prince was not fully
credible.

To determine whether a claimant's testimony about subjective pain or symptoms is credible,
the ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v.
Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the
claimant has presented objective medical evidence of an underlying impairment that reasonably
could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at
1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ
can reject the claimant's testimony about the severity of his symptoms only by offering specific,
clear, and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony not
reliable, the ALJ must "specifically identify what testimony is credible and what testimony
undermines the claimant's complaints."  *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's

19

1    credibility determination if it is supported by substantial evidence in the record.  *See Thomas*, 278

2    F.3d at 959.

3        Here, the ALJ satisfied the first prong because it found that Mr. Prince's impairments could

4    reasonably cause some of the alleged symptoms.  *See* AR 33.  Under the second prong, the ALJ

5    did not state that Mr. Prince was malingering and found that Mr. Prince's statements about the

6    "intensity, persistence, and limiting effects of these symptoms" were credible to the extent that

7    they were consistent with his determination of the RFC.  *See* AR 33.  Because the ALJ did not find

8    that Mr. Prince was malingering, she may only reject Mr. Prince's testimony regarding his

9    symptoms by offering specific, clear, and convincing reasons.

10       In determining that Mr. Prince was not fully credible, the ALJ balanced Mr. Prince's testimony

11   about his abilities to care for himself and others against the following: 1) the medical evidence

12   does not support the severity of Mr. Prince's complaints; and 2) Mr. Prince's inconsistent

13   statements.  AR 32-33.  The ALJ's credibility findings are supported by the record as noted below

14   and by Ninth Circuit case law.

15       Mr. Prince contends that his daily activities do not undermine his credibility.  Pl.'s Mot., ECF

16   No. 25 at 19-20.  The ALJ noted Mr. Prince testified that "he took care of his cat, took care of his

17   personal grooming needs, prepared simple meals, made his bed, washed dishes, walked, used

18   public transportation, drove (albeit on his expired license), and shopped twice a month."  AR 32.

19   In addition to Mr. Prince's testimony, the ALJ noted that Mr. Prince told Dr. Seu that he helps

20   take care of his grandson.  AR 33.  The ALJ concluded that Mr. Prince's daily activities are not

21   consistent with a person with such disabling symptoms and conditions.  AR 33.  *See Fair v.*

22   *Bowen*, 885 F.2d 597 (9th Cir. 2007) (holding that the ALJ properly discredited claimant's

23   testimony of disabling pain based on several factors, including claimant's daily activities and

24   personal task).

25       Next, Mr. Prince argues that lack of support in objective medical evidence is legally

26   insufficient to discount his testimony.  Pl.'s Mot., ECF No. 25 at  17.  In her decision, the ALJ

27   explained that Mr. Prince's symptoms from his asthma and HIV did not appear to be as disabling

28   as he alleged.  AR 33-34.  With respect to Mr. Prince's asthma, the ALJ explained that he

United States District Court
Northern District of California

20

continues to smoke despite his condition.  AR 34.  The ALJ then turned to Mr. Prince's HIV treatment.  Even though Mr. Prince had been HIV-positive for 15 years, the ALJ opined that he did not receive treatment until September 2008.  AR 33.  The ALJ further noted that Mr. Prince's HIV is well controlled with undetectable viral loads.  AR 34.  The record also shows that Mr. Prince only experienced mild symptoms and is obese with no significant weight loss or anemia as would be expected of someone experiencing severe symptoms from HIV.  AR 33.  In determining Mr. Prince's credibility, the ALJ also explained that "[t]here is no opportunistic infection or neoplasia" due to his HIV positive status.  AR 33.  Although lack of objective medical evidence supporting the degree of limitation cannot be the sole basis for discounting a claimant's testimony, it is a factor that an ALJ may consider in assessing credibility.  *See Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005) (finding that "lack of objective medical evidence cannot form the sole basis for discounting pain testimony," but that the ALJ may consider it in assessing the claimant's credibility).

Another factor that the ALJ considered was inconsistency in Mr. Prince's statement.  AR 32. The ALJ considered Mr. Prince's answer to an HIV questionnaire in determining that Mr. Prince is not credible.  AR 33.  Specifically, Mr. Prince stated that the reason he is not working is due to his criminal history and lack of trade value rather than his disabling conditions.  AR 33.   This is contrary to Mr. Prince's testimony at the hearing that he is unable to work due to his impairments. *See* AR 61-62.  The ALJ may consider such inconsistent statements.  *See Bradford v. Astrue*, EDCV 07-1022-JTL, 2008 WL 2523833 (C.D. Cal. June 20, 2008) (holding that "ALJ properly cited to the inconsistences in plaintiff's statements regarding the reasons she was unable to work" as a factor for finding that plaintiff was not credible) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (noting that the ALJ may consider ordinary techniques of credibility such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid").

Because the ALJ's credibility determination is supported by substantial evidence in the record, the court defers to that determination.

**B.  ALJ Improperly a Medical Opinion**

21

United States District Court
Northern District of California

1    Mr. Prince challenges the ALJ's opinion for improperly "ignoring" two medical opinions: 1)

2    Dr. Taylor and 2) Dr. Foster-Valdez.  Pl's Mot., ECF No. 25 at 8.  When determining whether a

3    claimant is disabled, the ALJ must consider each medical opinion in the record together with the

4    rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010

5    WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social Security Administration

6    favors the opinion of a treating physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d

7    625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a treating physician is

8    given deference because 'he is employed to cure and has a greater opportunity to know and

9    observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595,

10   600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "However, the

11   opinion of the treating physician is not necessarily conclusive as to either the physical condition or

12   the ultimate issue of disability."  *Id.* (citing *Magallanes*, 881 F.2d at 751 and *Rodriguez v. Bowen*,

13   876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

14    "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

15   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

16   case record, [it will be given] controlling weight.'"  *Orn*, 495 F.3d at 631(quoting 20 C.F.R. §

17   404.1527(d)(2)).  "If a treating physician's opinion is not given 'controlling weight' because it is

18   not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

19   [Social Security] Administration considers specified factors in determining the weight it will be

20   given."  *Id.*  "Those factors include the '[l]ength of the treatment relationship and the frequency of

21   examination' by the treating physician; and the 'nature and extent of the treatment relationship'

22   between the patient and the treating physician."  *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

23   "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

24   treating physician, include the amount of relevant evidence that supports the opinion and the

25   quality of the explanation provided; the consistency of the medical opinion with the record as a

26   whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the

27   degree of understanding a physician has of the [Social Security] Administration's 'disability

28   programs and their evidentiary requirements' and the degree of his or her familiarity with other

22

information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).  Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)).  Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  "'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)) (emphasis added).  "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss*, 427 F.3d at 1216) (emphasis added).[4]  Opinions of non-examining doctors alone

_____

[4]  Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different.  As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion.  While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors—neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an

United States District Court
Northern District of California

cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

### 1. Dr. Taylor's Opinion

First, Mr. Prince contends that the ALJ erred by rejecting the opinion of Dr. Taylor, an examining physician.[5] Pl's Mot., ECF No. 25 at 8. The ALJ provided no weight to Dr. Taylor for the following reasons: 1) the opinion was an "attorney referred evaluation that is not supported by treatment notes of record or by the evaluation that Dr. Taylor himself conducted;" and 2) Mr. Prince has not received psychiatric treatment since 2007. To demonstrate that Dr. Taylor's opinion is not supported by the medical record or Dr. Taylor's own treatment notes, the ALJ provided an example. AR 35. She stated,

> For example, Dr. Taylor opined he had marked limitations in carrying out short simple instructions, maintaining concentration, attention and persistence, responding appropriately to changes in the work setting and completing a normal

---

examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

[5] Mr. Prince identifies Dr. Taylor as a treating physician in his motion for summary judgment. Pl's Mot., ECF No. 25 at 8. In the Commissioner's cross-motion, she identifies Dr. Taylor as an examining physician. "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). It does not appear that Mr. Prince was seen by Dr. Taylor for the purposes of treatment. Dr. Taylor's report indicates that Mr. Prince was referred by his counsel for a "psychological evaluation because he presents as being eligible for disability benefits." AR 945. Even though Mr. Prince was seen for two evaluation sessions, Dr. Taylor indicated that the "first evaluation session was used primarily to do a comprehensive mental status examination and pre test interview" and the second session "was used to administer psychological tests that were used for this evaluation." AR 945.

24

workweek without interruption from psychological symptoms but the evaluation at Exhibit 21F, p. 4 says he has an adequate long-term memory, is a reliable historian, has some difficulty with his short term memory, his concentration was adequate, and his attention and concentration was adequate throughout the evaluation, and he actually was hypervigilant, with him paying attention to everything Dr. Taylor did and said.

AR 35.  Despite noting that Mr. Prince's attention and concentration is adequate in his treatment notes, Dr. Taylor concluded that Mr. Prince had a marked limitation in maintaining concentration, attention and persistence.  This example demonstrated that Dr. Taylor's conclusion and his treatment notes contradicted each other.  Thus, even though Mr. Prince's failure to seek continued treatment for his psychological problems is not a sufficient basis to reject a medical opinion, the ALJ provided other reasons that are supported by law.  *Connett v. Barnhart*, 340 F.3d 871, 874-75 (9th Cir. 2003) (holding that the ALJ properly rejected the opinion of a treating physician that was inconsistent with his own treatment notes and other physicians' opinion); *Saelee v. Chater*, 94 F.3d 520, 522 (1996) (holding that the ALJ properly rejected treating physician's solicited report as untrustworthy when "it was obtained solely for the purposes" of the hearing, varied from that physician's own treatment notes, and "worded ambiguously in an apparent attempt" to help claimant obtain benefits).

### 2.  Dr. Foster-Valdez's Opinion

Second, Mr. Prince contends that the ALJ stated that she provided great weight to the opinion of Dr. Foster-Valdez, a non-examining physician, but the ALJ's RFC failed to reflect Dr. Foster-Valdez's opinion, requiring a moderate limitation in "the ability to accept instructions and respond appropriately to criticism from supervisors."  Pl's Mot., ECF No. 25 at 9-12; *see* AR 796.  Rather, the ALJ's RFC only accounted for an occasional limitation with coworkers and the public.  AR 32, 34.

In the "Mental Residual Functional Assessment," Dr. Foster-Valdez checked boxes, indicating that Mr. Prince had a moderate limitation in the following: 1) the ability to accept instructions and respond appropriately to criticism from supervisors; 2) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 3) the ability to interact appropriately with the general public.  AR 796.  Dr. Foster-Valdez further explained the functional

capacity assessment in the summary section.  She stated that the "Clmt's [meaning, Mr. Prince's] ability to respond appropriately to supervisors, coworkers and work situations is limited per his report, he would likely do best in setting w/ limited social contact."[6]  AR 797.  Despite providing "great weight" to Dr. Foster-Valdez's opinion, the ALJ's RFC did not provide any limitation on Mr. Prince's ability to respond appropriately to supervisors.[7]

Unlike Dr. Foster-Valdez, Dr. El-Sokkary, an examining physician, reported that Mr. Prince "was cooperative throughout the evaluation and was capable of adequately communicating and therefore would be able to appropriately interact with supervisors and co-workers at this time." AR 768.  In her decision, the ALJ stated, "I give weight to Dr. Sokkary's opinion (except I gave a limitation of occasional interaction with co-workers and the public)."  AR 34.  Consequently, the ALJ rejected Dr. El-Sokkary's finding that Mr. Prince could communicate with co-workers.  AR 34.

The Commissioner argues that the ALJ did not err because 1) the ALJ "expressly accepted only the restrictions for limited interactions with coworkers and the public from the reviewing physician's evaluation [meaning, Dr. Foster-Valdez]" and 2) "substantial evidence existed" in Dr. El-Sokkary's opinion to support the ALJ's RFC.  Comm'r's Opp'n and Cross-mot., ECF No. 28 at 3.  Despite the Commissioner's contention, the problem is that the ALJ did not provide an explanation for why she only selected to adopt a portion of Dr. Foster-Valdez's opinion.  *See* AR 34 (noting that the RFC accounted for an occasional limitation with co-workers and the public). At the same time, the ALJ rejected the other portion of Dr. Foster-Valdez's opinion regarding Mr. Prince's ability to appropriately respond to his supervisors.  *See* Social Security Ruling 96-8p ("if

---

[6]  The court observes that the Commissioner, in her opposition, misinterpreted Dr. Foster-Valdez's statement as meaning that "Plaintif*f had the ability to respond* 'appropriately' to supervisors, coworkers and work situations, and would likely do best in a setting with limited social contact." *See* Comm'r's Opp'n and Cross-mot., ECF No. 28 at 2 (emphasis added).

[7]  Dr. Foster-Valdez's statements were acknowledged by the ALJ.  AR 34.  Specifically, the ALJ stated that Dr. Foster-Valdez concluded that Mr. Prince could "respond appropriately to supervisors, co-workers and work situations, with limited social contact, and deal with changes in a routine work setting."  AR 34.

United States District Court
Northern District of California

1    the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain

2    why the opinion was not adopted.").  To the extent that the ALJ found that Mr. Prince could

3    interact appropriately with his supervisors based on Dr. El-Sokkary's opinion, the ALJ also did

4    not provide a reason for why she only adopted this portion of his opinion and rejected Dr. Foster-

5    Valdez's opinion in this regard.  *See* AR 34.  Even though an examining physician such as Dr. El-

6    Sokkary is typically given more weight than a non-examining physician, the problem is that the

7    two physicians' opinions conflicted and the ALJ did not explain why she adopted certain parts of

8    one opinion over the other.

9         This statement regarding Mr. Prince's inability to appropriately respond to his supervisor is

10   not inconsequential.  The VE testified that a hypothetical including all the limitations listed in the

11   ALJ's RFC combined with a moderate restriction on the ability to appropriately respond to

12   supervisors would preclude Mr. Prince from being employed in any job.  As such, the undersigned

13   cannot say that this is a harmless error and therefore, remand for a proper inquiry into Mr. Prince's

14   ability to interact with his supervisors, coworkers, and the public.  *See Molina*, 674 F.3d at 1122.

15   In light of the court's holding to remand, the ALJ is free to reconsider the weight given to the

16   opinions of Drs. Foster-Valdez and El-Sokkary.[8]

17                                        **CONCLUSION**

18        The court **GRANTS** Mr. Prince's motion for summary judgment and **DENIES** the

19   Commissioner's cross-motion for summary judgment.  The matter is remanded for further

20   proceedings consistent with this order.

21        This disposes of ECF Nos. 25 and 28.

22   ///

23

_____

24   [8]  Here, the ALJ provided "great weight" to Dr. Foster-Valdez because her opinion is consistent
25   with the medical record; however, the only opinion, other than Dr. Foster-Valdez's, that the ALJ
     accorded weigh to was Drs. El-Sokkary and Seu.  *See* AR 34-35.  Dr. Seu's report did not discuss
26   Mr. Prince's ability to interact with the public, his coworkers, or supervisors, and Dr. El-Sokkary's
     opinion contradicted Dr. Foster-Valdez in this respect.  *See* AR 861-64.  Therefore, it is not clear
27   to the court which medical record that the ALJ relied on to arrive at her conclusion.  Because it is
     not clear to the court how the ALJ arrived at this conclusion, remand is proper to conduct a proper
28   inquiry.

1          **IT IS SO ORDERED**.

2     Dated: September 25, 2013

3                                                   _____
                                                    LAUREL BEELER
                                                    UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER 12-CV-05609-LB