1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6                               San Francisco Division

7

8     RONALD V. PRINCE,                          Case No.  3-12-CV-05609-LB

                  Plaintiff
9                                                **ORDER (1) GRANTING PLAINTIFF'S**
                                                 **MOTION FOR SUMMARY**
10          v.                                   **JUDGMENT, (2) DENYING**
                                                 **DEFENDAT'S CROSS-MOTION FOR**
11    CAROLYN W. COLVIN, Acting                  **SUMMARY JUDGMENT, AND (3)**
      Commissioner of Social Security,           **REMANDING FOR FURTHER**
12                                               **CONSIDERATION**
                  Defendant.
13                                               [Re ECF Nos. 25, 28]

14

15                                   **INTRODUCTION**

16          Plaintiff Ronald Prince moves for summary judgment, seeking judicial review of a final

17    decision by defendant Carolyn W. Colvin, the Acting Commissioner of Social Security

18    Administration (the "Commissioner"), denying him Social Security Income ("SSI") disability

19    benefits for his claimed disability of depression, HIV, vomiting/diarrhea, bronchial infections, and

20    bipolar disorder.  Pl.'s Mot., ECF No. 25;[1] Administrative Record ("AR") 1.  The Administrative

21    Law Judge determined that Mr. Prince could not perform his past relevant work but that he was

22    capable of performing other jobs that existed in significant numbers in the national economy.  AR

23    36-37.

24          Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

25    without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 5, 16.

26

27    _____
      [1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at
28    the top of the document.

United States District Court
Northern District of California

For the reasons stated below, the court **GRANTS** Mr. Prince's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case for further reconsideration.

**STATEMENT**

**I. PROCEDURAL HISTORY**

Mr. Prince, now 45 years old, filed a Title II application for a period of disability and disability insurance benefits on September 24, 2008. AR 80, 27. The Commissioner denied his application both initially and upon reconsideration. AR 92-95, 189. On January 28, 2010, Mr. Prince timely requested a hearing before an ALJ. AR 27. An ALJ conducted a hearing on April 20, 2011 in Oakland, California. AR 45. Mr. Prince appeared with his attorney, Ms. Vyonne Troya, and testified at the hearing along with vocational expert Jo Ann Yoshioka (the "VE"). AR 27, 45.

The ALJ issued a decision on June 17, 2011 and found that Mr. Prince was not disabled because he was capable of performing other jobs that existed in significant numbers in the national economy. AR 36-37.

Mr. Prince timely requested that the Appeals Council review the ALJ's decision. AR 21-22. The Appeals Council denied the request for review on September 5, 2012. AR 1. That denial rendered the ALJ's June 17, 2011 decision the Commissioner's final decision. AR 1.

Mr. Prince filed a complaint for judicial review under 42 U.S.C. § 405(g). Compl., ECF No. 1. Mr. Prince and the Commissioner both now move for summary judgment. Pl.'s Mot., ECF No. 25; Comm'r's Opp'n and Cross-mot., ECF No. 28.

**II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

This section summarizes (A) the medical evidence in the administrative record, (B) the vocational expert's testimony, (C) Mr. Prince's testimony, and (D) the ALJ's findings.

    **A. Medical Evidence**

        *1. Dr. Ahmed El-Sokkary on 05/08/09*

On May 8, 2009, Dr. Ahmed El-Sokkary, a clinical psychologist, examined Mr. Prince. AR 766-69. Mr. Prince complained of "high blood pressure, HIV, arthritis, COPD, [m]aniac depression, and back injury." AR 766. In terms of Mr. Prince's "present level of functioning,"

2

1    Dr. El-Sokkary reported that Mr. Prince "is able to care for hygiene, grooming, daily living

2    activities, including light cooking and cleaning."  AR 766.  Dr. El-Sokkary also described his

3    education, medical history with HIV, and family history with an abusive father.  AR 766.

4        Dr. El-Sokkary administered several tests: 1) WMS/WAIS-III, 2) Bender Gestalt-II, and 3)

5    Trails A & B.  AR 766.  As for the WAIS-III, Dr. El-Sokkary opined that Mr. Prince's results

6    were in the Low Average range, except for an Average range for his Verbal Comprehension

7    Index.  AR 768.  Mr. Prince obtained the following scores: Full Scale IQ of 85, Verbal Scale of

8    88, Performance score of 84, Perceptual Organization Index of 84, and Verbal Comprehension

9    Index of 94.  AR 768.

10       Mr. Prince's other examination showed a normal or average range.  AR 768.  With respect to

11   Trails A & B, Dr. El-Sokkary indicated that Mr. Prince had "normal psychomotor speed, visual

12   scanning, and mental flexibility."  AR 768.  On the WMS-III examination, Mr. Prince's

13   "immediate and delayed visual memory results were all within normal limits."  AR 768.  Lastly,

14   on the Bender-Gestalt II test, Mr. Prince's results "suggested normal visual motor integration

15   abilities that are within the average range."  AR 768.

16       In the Medical Source Statement, Dr. El-Sokkary further elaborated on Mr. Prince's limitation.

17   AR 768-69.  Dr. El-Sokkary stated,

18

19           Based solely on the current evaluation and from a strictly cognitive and emotional
             standpoint, claimant demonstrates a capacity to understand, remember, and perform
20           simple tasks.  Claimant was able to maintain a sufficient level of concentration,
             persistence, and pace to do basic work in an environment that health condition
21           would allow.  Claimant was cooperative throughout the evaluation and was capable
             of adequately communicating and therefore would be able to appropriately interact
22           with supervisors and co-workers at this time.  However, given his overall outlook,
             reported psychiatric history, and self conception he is at risk for further emotional
23           dysfunction in response to elevated distress and the lack of prescription medication.

24   AR 768-69.

25       Ultimately, Dr. El-Sokkary diagnosed Mr. Prince with the following conditions: mood

26   disorder, NOS; R/O psychotic disorder, NOS; back injuries; HIV; high blood pressure;

27   arthritis; and COPD with a GAF 60.  AR 768.

28           *2.  APEB Wellness Center from 01/31/08 – 04/05/11*

United States District Court
Northern District of California

1    Mr. Prince has asymptomatic HIV infection.  AR 824.  Since June 2006, Mr. Prince has

2    received HIV treatment from the AIDS Project East Bay Wellness Center in Oakland.  AR 964.

3    He has received care from doctors, physician's assistant, and nurse practitioners at the Center.  AR

4    799-860.  The court has included summaries of the relevant opinions below.

5                              *i.  Dr. Beatrice Morris*

6    On October 21, 2008, Dr. Beatrice Morris reported that Mr. Prince felt "fairly well today."

7    AR 832.  Despite feeling well on the day of the appointment, Mr. Prince complained of having

8    pain while sleeping.  AR 832. Dr. Morris also noted that Mr. Prince injured his shoulder while

9    weight lifting in 1992.  AR 832.  Due to these conditions, Dr. Morris noted that Mr. Prince takes

10   Ativan to address his sleeping problem and vicodin for his right shoulder pain.  AR 832.

11   Ultimately, Dr. Morris assessed Mr. Prince with the following conditions: 1) asymptomatic HIV

12   infection; 2) chronic right shoulder pain; and 4) elevated LFT.  AR 832.

13   About a month later, Dr. Morris reported a similar assessment.  AR 831.  He noted that Mr.

14   Prince is HIV asymptomatic and is doing well on Atripia.  AR 831.  Dr. Morris also noted that Mr.

15   Prince has a sleep disorder and recurrent right shoulder pain.  AR 831.  Despite his right shoulder

16   pain, Mr. Prince, Dr. Morris opined, continues to work regularly at various odd jobs.  AR 831.

17                          *ii.  Nurse Practitioner Euredis Chipendo*

18   On February 3, 2009, Ms. Euredis Chipendo, a nurse practitioner at APEB Wellness Center,

19   reported that Mr. Prince's cough, which has persisted for a week is keeping him awake at night.

20   AR 828.  With respect to Mr. Prince's HIV condition, she indicated that Mr. Prince's "[v]iral load

21   remains undetectable."  AR 828.

22   About five months later, Ms. Chipendo noted the following in Mr. Prince's treatment record:

23   "Bipolar disease per pt report: Medical records from Contra Costa County requested."  AR 809.

24   She also reported that Mr. Prince's chronic shoulder pain was stable with vicodin.  AR 809.

25                          *iii.  Physician Assistant Nais Raulet*

26   On April 5, 2011, Mr. Prince told Ms. Nais Raulet, the physician's assistant, that he has

27   unpredictable diarrhea three times per day.  AR 962.  Ms. Raulet also reported that Mr. Prince had

28   not received psychiatric treatment.  AR 962.  In the subjective complaint section, Ms. Raulet

United States District Court
Northern District of California

4

1  reported the following:

2

3       Ong[o]ing fatigue since approx. 2004.  Naps 1-1 ½ hours q am and q afternoon
        without feeling completely refreshed.  No TOH or drugs.  Diarrhea tid is
4       unpredictable and explosive at times.  Not yet gone to Sausal Creek to get
        psychiatric evaluation.  They have no appts available.  [He] was told to drop in on
5       Monday at 8am to wait for a possible slot.  Still hestitates to go in due to previous
        hx  [meaning, history] of bad experience with psychiatrist who 51/50'd him years
6       ago.  Is not currently suicidal or homicidal.  [He] [c]ontinues to isolate, to have
        issues with anger management, to avoid going out, to suffer anhedonia.  Has
7       difficulty interacting and managing conflict with others, which prevents him from
        holding down jobs.  Difficulty with coworkers and supervisors.  Dx'd bipolar since
8       at least 2006 and off meds since not covered on adap and last regimen caused side
        effects.  Respiradol caused increased aggressiveness.  No psychiatrist evaluation
9       and treatment since jail 2007.

10  AR 962.  In Ms. Raulet's objective evaluation section, she observed that Mr. Prince weeps at

11  times.  AR 962.  Ultimately, Ms. Raulet assessed that Mr. Prince has the following conditions: 1)

12  HIV with ongoing fatigue and diarrhea but controlled and adherent with undetectable viral loads;

13  2) Bipolar; 3) PTSD; and 4) depression.  AR 962.

14          *vi.  Dr. Denis Bouvier*

15      Dr. Denis Bouvier submitted a letter dated April 14, 2011 to "expand on the notes in Mr.

16  Prince's medical chart."  AR 964.  Dr. Bouvier opined that Mr. Prince regularly experiences

17  debilitating symptoms related to his HIV illness.  AR 964.  More specifically, he experiences

18  anxiety, depression, fatigue, night sweats, respiratory problems, vomiting, and diarrhea.  AR 964.

19  Due to these symptoms, Dr. Bouvier concluded that Mr. Prince's daily activities are markedly

20  restricted.  AR 964.  In particular, Dr. Bouvier pointed to Mr. Prince's unpredictable diarrhea as a

21  symptom that "interferes with his ability to leave the house and manage outside activities."  AR

22  964.  Dr. Bouvier also mentioned that Mr. Prince has asthma.  AR 964.

23      In addition to asthma and the disabling symptoms Mr. Prince experiences from his HIV

24  illness, Dr. Bouvier also mentioned that Mr. Prince experiences insomnia and side effects due to

25  his HIV medications.  AR 964.  Dr. Bouvier opined that Mr. Prince's "fatigue requires him to take

26  at least two 1-hour unscheduled naps every day."  AR 964.

27      In addition to the medication's side effects, Dr. Bouvier also reported that Mr. Prince "suffers

28  from severe bipolar disorder, chronic post traumatic stress disorder, paranoid ideation, social

United States District Court
Northern District of California

5

1   withdrawal and chronic anxiety." AR 964.  In his letter, Dr. Bouvier explained that "Mr. Prince's
2   depression is evidence by his profound feelings of shame and worthlessness that are likely
3   aggravated by his inability to work, and his HIV diagnosis." AR 964.  In addition, he noted that
4   Mr. Prince isolate himself in his apartment and has lost interest in social activities. AR 964. Dr.
5   Bouvier opined that Mr. Prince suffers from sleep disturbance and is often tearful. AR 964-65.

6   Ultimately, Dr. Bouvier concluded that "it would be impossible for Mr. Prince to work at this
7   time or for the foreseeable future." AR 965.  He found that Mr. Prince had the following
8   limitations: 1) unable to maintain sustained concentration and focus; 2) difficulty interacting with
9   others; 3) difficulty responding appropriately to supervisors and co-workers on a consistent basis;
10  4) unable to sit for six hours per day due to his chronic shoulder and lower back pain; and 5)
11  unable to stand or walk for more than an hour without a lengthy resting period due to his fatigue
12  and peripheral. AR 965.

13      *3.  Dr. Warren Taylor on 03/09/11 & 03/16/11*

14      In March 2011, Dr. Warren Taylor conducted a "Psychological Evaluation" of Mr. Prince.  AR
15  945-61.  Dr. Taylor's diagnostic impressions included: 1) Bipolar I Disorder, Mixed, Severe with
16  Mood-Congruent Psychotic Fear; 2) Severe and Chronic Postraumatic Disorder; 3) Early Onset of
17  Dysthymic Disorder; 4) Cocaine Dependence with Sustained Full Remission; and 5) "Personality
18  Disorder NOS with Borderline, Paranoid and Antisocial Features with Depressive, Passive-
19  Aggressive and Obsessive-Compulsive Traits." AR 959.  His GAF result showed a score of 40,
20  which Dr. Taylor indicated as serious. AR 959.

21      With respect to Mr. Prince's MCMI-III results, Dr. Taylor reported that "Mr. Prince's response
22  style may indicate a broad tendency to magnify the level of experienced illness or a
23  characterological inclination to complain or be self-pitying." AR 956.

24      In the Medical Source and Competency Statement, Dr. Taylor determined that Mr. Prince has
25  many psychological issues, including anger, anxiety, and depression. AR 959-60. Dr. Taylor
26  explained,

27
28              Mr. Prince will be unable to work on a regular and consistent basis with the next
                months based on his severe psychopathology.  His explosive outbursts of anger and

6

1
2
3
4
5
6

> aggression are reactivity symptoms of his PTSF, as are his flashbacks, bad memories, nightmares, persistent suicidal ideation, irritability, avoidance, and his extremely low tolerance for frustration. His PTSD is exacerbated and comorbid with his Bipolar I Disorder, Mixed Severe with Mood-Congruent Psychotic Features. There is definitely similar symptoms and overlap in both of these disorders. His Bipolar Disorder can be seen as cyclic change in his mood and energy, with it being a cyclic mixture of both Major Depressive and Manic Episodes. His history indicates that he has had a persistent and moderate depression since he was a child as seen in persons with a Dysthymic Disorder. His history of abusing and being dependent on illegal drugs was a way for him to numb himself, basically, self-medicating and has been secondary to his other mental health problems.

7      AR 959-60. Due to Mr. Prince's various psychological issues, Dr. Taylor concluded that he could

8      not work. AR 959-60.

9          In examining Mr. Prince, Dr. Taylor determined that Mr. Prince had a marked impairment in

10     the following work-related activities: 1) carry out short, simple instructions; 2) carry out detailed

11     (complex) instructions; 3) maintain concentration, attention, and persistence; 3) perform activities

12     within a schedule and maintain regular attendance; 4) complete a normal workday and workweek

13     without interruptions from psychologically-based symptoms; and 5) respond appropriately to

14     changes in work setting. AR 961. In addition, Dr. Taylor found that Mr. Prince had a slight

15     impairment in understanding and remembering short and simple instructions and a moderate

16     impairment in understanding and remembering detailed (complex instructions). AR 961. Despite

17     these findings, Dr. Taylor reported that "Mr. Prince does have the ability to hear, sit, stand, walk,

18     move about, carry and handle objects, speak and travel independently." AR 961.

19          *4. Dr. Phillip Seu on 11/18/08*

20         In November 2008, Dr. Phillip Seu, a surgeon, completed a "comprehensive internal medicine

21     evaluation." AR 861-63. In examining Dr. Prince's range of motion, Dr. Seu found that Mr.

22     Prince's shoulder had no tenderness or deformity and that he had a full range of motion. AR 863.

23     With respect to functional limitations, Dr. Seu did not find any limitations. Specifically, Dr. Seu

24     reported that Mr. Prince did not have any limitations in the following: the number of hours that he

25     can stand or walk in an eight-hour workday; the amount of weight that he can carry or lift; ability

26     to bend, stoop, or crouch (postural limitation); ability to reach, handle, feel, grasp, and finger

27     (manipulative limitation). AR 864. He also did not find that Mr. Prince required workplace

28     environmental restrictions or needed an assistive device. AR 864.

United States District Court
Northern District of California

7

1

          5.  *Dr. Foster-Valdez on 06/08/09*

2          In June 2009, Dr. Jaine Foster-Valdez completed a "Psychiatric Technique Review."  Dr.

3     Foster-Valdez indicated that Mr. Prince had the following functional limitation: 1) mild restriction

4     in activities of daily living; 2) moderate difficulties in maintaining social function; and 3) mild

5     difficulties in maintaining concentration, persistence, or pace.  AR 791.  In the Consultant's Notes

6     section of the report, Dr. Foster-Valdez indicated that Mr. Prince is "viewed as partially credible."

7     AR 793.

8          In addition to a "Psychiatric Technique Review," Dr. Foster-Valdez also completed a "Mental

9     Residual Function Capacity Assessment."  AR 795.  In the report, she indicated the following

10    moderate limitations: 1) ability to understand and remember detailed instructions; 2) ability to

11    carry out detailed instructions; 3) ability to interact appropriately with general public; 4) ability to

12    accept instructions and respond appropriately to criticism from supervisors; 5) ability to get along

13    with coworkers or peers without distracting them or exhibiting behavioral extremes; and 6) ability

14    to respond appropriately to changes in the work setting.  AR 795-96.

15         In the "Functional Assessment" section, Dr. Foster-Valdez provided the following explanation

16    for her conclusions:

17

18          Clmt [meaning, claimant] is able to meet all of the basic mental demands of
            competitive, remunerative, unskilled work including:
            Clmt is able to understand, remember and carry out simple instructions.
19          Clmt is able to make simple work related decisions, maintain a simple schedule and
            complete simple tasks on a consistent basis.
20          Clmt's ability to respond appropriately to supervisors, coworkers and work
            situations is limited per his report, he would likely do best in setting w/ limited
21          social contact.
            Clmt is able to deal with changes in a routine work setting.
22

23    AR 797.

24    **B.  Vocational Expert's Testimony**[2]

25         Ms. Jo Ann Yoshioka, the VE, identified Mr. Prince's past relevant work as 1) a case aide

26    (DOT # 195.367-010) at SVP 3 with light strength; 2) electrical helper (DOT #829.684-022) at

27    _____

28    [2]  Because the hypotheticals that Mr. Prince's counsel posed to the VE are not at issue, the court
      did not include the hypotheticals here.

                                              8

*United States District Court*
*Northern District of California*

SVP 3 with medium strength[3]; 3) material handler (DOT #929.687-030) at SVP 3 with heavy strength; 4) cable installation (DOT #821.281-010) at SVP 5 with heavy strength; and 5) general laborer (DOT # 922.687-058) at SVP 2 with medium strength.  AR 68.

At the hearing, the ALJ stated that she was going to "find that the cable installation was not done on a full time basis" and inquired "if there were any skills other than that that would be transferable?"  AR 69.  The VE stated that there are three such positions: 1) electronics worker (DOT #726.687-010) at SVP two, light strength, and 1,800 positions regionally and 280,000 nationally; 2) assembler I (light fixtures) (DOT #723.684-014) at SVP 3, light strength, and 2,100 positions regionally and 245,000 nationally; and 3) patcher (DOT #723.687-010) at SVP 2, sedentary strength, and 1,800 positions regionally and 280,000 nationally.  AR 69-70.

The ALJ then posed a hypothetical of an individual with Mr. Prince's age, education, and work background plus the following limitations: 1) ability to complete "medium work"; 2) ability to perform simple tasks consistent with SVP 2, entry-level work; 3) ability to make simple, work-related decisions with few changes in the work place; 4) occasional interaction with coworkers and the public; and 5) avoidance of concentrated exposure to extreme cold, fumes, gases, dusts, odors, and poor ventilation.  AR 70-71.  The VE responded that such a person would not be able to perform Mr. Prince's past relevant work.  AR 71.

Alternatively, the VE found that such an individual would be able to perform the following positions: 1) crate liner (DOT #923.687-078) at SVP 2, medium strength, and 5,200 positions regionally and 770,00 nationally; 2) box bender (DOT #641.687-010) at SVP 1, medium strength, and 1,800 positions regionally and 280,000 nationally; 3) bottle packer (DOT #920.685-026) at SVP 2, light strength, and 3,400 positions regionally and 357,000 nationally; 4) small products assembler (DOT #706.684-022) at SVP 2, light strength, and 1,800 positions regionally and 280,000 nationally; 5) classifier (laundry & related) (DOT #361.687-014) at SVP 2, light strength, and 4,700 positions regionally and 467,000 nationally; 6) patcher (DOT #723.687-010) at SVP 2,

---

[3]  With respect to Mr. Prince's work as an electrical helper, the VE indicated that the type of work and the lifting that he described in his testimony more accurately depicts a position with heavy strength as opposed to the medium strength listed in the DOT for an electrical helper.  AR 69.

United States District Court
Northern District of California

sedentary strength, and 1,800 positions regionally and 280,000 nationally; 7) weight tester (DOT #539.485-018) at SVP 2, sedentary strength, and 4,700 positions regionally and 467,000 nationally; and 8) nut sorter (DOT #521.687-086) at SVP 2, sedentary strength, and 4,700 positions regionally and 467,000 nationally.  AR 71-72.

In a second hypothetical, the ALJ combined the limitations described in the first hypothetical with an additional limitation requiring no reaching overhead with the "right upper extremity." AR 72.  The VE testified that such an individual would be precluded from performing all medium strength positions.  AR 72-73.  Therefore, all the above-mentioned positions would still be available except for the positions requiring medium strength.  AR 72-73.

In the third hypothetical, the ALJ combined the limitations mentioned in the first and second hypothetical with an additional limitation: requiring only occasional interaction with supervisors. AR 73.  The VE found that this would preclude all jobs.  AR 73.

### C.  Mr. Prince's Testimony

With respect to his education, Mr. Prince testified that he had completed high school and some vocational training school.  AR 52.  Mr. Prince further explained that he is able to read, write, and perform simple math.  AR 53.

Mr. Prince then testified regarding his work experience.

In November 2008, he served as an election poll worker for one day.  AR 53, 404.

From March 2008 to May 2008, Mr. Prince served as a full-time trailer attendant for Goodwill Industries.  AR 53, 404.  As a trailer attendant, Mr. Prince "took in all acceptable donations," lifting and carrying items that weighed 40 to 50 lbs.  AR 53.  Mr. Prince testified that he was later terminated from the position because he engaged in an argument with his supervisor and did not report to work the following day.  AR 53.  Mr. Prince stated that the reason provided for terminating him was job abandonment.  AR 53.

Prior to serving as a trailer attendant at Goodwill Industries, Mr. Prince was employed at a Shelter for the Homeless.  AR 54, 404.  At this shelter, Mr. Prince served as a counselor from February 2003 to November 2003.  AR 404.  His responsibilities included "checking on . . . clients" and working with and feeding "dually diagnosed clients" and "homeless clients."  AR 54.

United States District Court
Northern District of California

10

1   In this role, Mr. Prince testified that he was "basically a paid babysitter."  AR 54.  As with his

2   position at Goodwill Industries, Mr. Prince testified that he was terminated from his position at the

3   shelter.  AR 54.  Mr. Prince explained that he had a disagreement with his supervisor who

4   requested that he explain his absences.  AR 54.  Because he refused to explain why he was absent,

5   the shelter, he testified, terminated him.  AR 54.

6       Mr. Prince also previously worked at Golden State Recycling where he was responsible for

7   picking up recyclable items.  AR 55.  He explained that this work was sporadic.

8       From September 1998 to October 2001, Mr. Prince served as an electrician's aide.  AR 56.  In

9   that capacity, he would install electrical items, including lighting, underground pipe, junction

10  boxes, and light switches.  AR 56.  As an electrician aide, the maximum weight he lifted and

11  carried was between 80-100 pounds.  AR 56.

12      Some time after he graduated from high school, Mr. Prince also completed cable installation

13  for a few companies.  AR 57.  Mr. Prince testified that he did "some piece work."  AR 57.

14      Since 2005, he performed volunteer work related to AIDS outreach with organizations such as

15  Volunteers of America and La Casa Segura.  AR 59-60.  As a volunteer, Mr. Prince packaged

16  condoms and safety kits.  AR 59.

17      After recounting his work history, Mr. Prince testified regarding the conditions that prevented

18  him from working.  AR 60.  The conditions he listed included neuropathy, chronic shoulder pain,

19  lower back pain, knee pain, cysts, and uncontrollable bowel movement.  AR 60.  He explained,

20

21          Because my body doesn't react the same any more due to neuropathy symptoms,
            HIV neuropathy symptoms through shoulder aggravations.  I've an old weight
22          lifting injury that turned into I guess arthritis cause there's a lot of calcium from
            what I understand, in my shoulders.  I have lower back issues.  My right knee tends
23          to swell up and I have both of my ankles are messed up.  I also suffer from
            persistent cysts that may grow in my groin areas or around my tail bone area.  I also
24          have, at times, uncontrollable bowel movement.  Which is subject to, well I've
            been subject to accidents.  Once on the job and a couple of times in public while I
25          was catching a bus.
            AR 60.

26

27  Specifically, Mr. Prince mentioned that his fatigue and pain prevents him from working.

28  AR 60.  He believes that the HIV medication coupled with being depressed, isolated, and

United States District Court
Northern District of California

11

1   overweight causes him to become fatigue and in pain.  AR 60.

2       With respect to his neuropathy, Mr. Prince described that it starts from the tip of his

3   fingers to his "forearm area" on both sides of his arms.  AR 61.  Moreover, while sitting or

4   lying down, he sometimes experiences neuropathy in both legs to the bottom of his feet.

5   AR 61.

6       With respect to his shoulder injury, he takes one Vicodin in the morning and at night in

7   order to relieve his pain.  AR 61.  After taking Vicodin, Mr. Prince testified that he

8   becomes drowsy.  AR 62.  Mr. Prince also has dry skin and persistent dry mouth.  AR 62.

9   He testified that he is not sure whether the Vicodin causes these symptoms.  AR 62.

10      With respect to his back pain, he testified that it "gets knotted up," stiff, and "just

11  go[es] out."  AR 62.  The pain depends on what Mr. Prince is doing.  AR 62.  It affects his

12  ability to bend as well as clean.  AR 62.  He testified that he is not receiving any treatment

13  for the lower back pain because he does not have "the insurance to cover that."  AR 63.

14      After Mr. Prince described his symptoms and physical limitations, the ALJ inquired

15  about Mr. Prince's "depression issues and PTSD issues."  AR 63.  Mr. Prince explained

16  that he isolated himself for the last couple of years.  AR 63.  He expounded that his doctors

17  indicated that he has PTSD due to a history of domestic violence and child abuse.  AR 63.

18  Mr. Prince also testified that he experiences anxiety and apprehension when he leaves his

19  apartment.  AR 66.  In addressing these issues, he has taken many medications, including

20  Wellbutrin, Depakote, Paxil, Risperdal, and Elavil.  AR 63.

21      Lastly, Mr. Prince testified regarding his drug problems.  AR 64.  Mr. Prince described

22  how his abusive father introduced him to cocaine at the age of 16.  AR 64.  He has

23  discontinued his drug use but has relapsed twice on a single use in 2007 and 2008.  AR 64.

24      **D.  ALJ's Findings**

25      Applying the sequential evaluative process, on June 17, 2011, the ALJ held that Mr. Prince was

26  not disabled under § 216(i) and 223(d) of the Social Security Act and therefore was not entitled to

27  disability insurance benefits.  AR 37.

28      At step one, the ALJ found that Mr. Prince had not engaged in substantial gainful activity since

United States District Court
Northern District of California

12

1    February 1, 1992 through June 17, 2011, the date of the decision.  AR 37.

2        At step two, the ALJ found that Mr. Prince suffered from the following severe impairments:

3    HIV, bipolar disorder, post-traumatic stress disorder, personality disorder, back and shoulder pain,

4    and polysubstance abuse in remission since 2007.  AR 29.

5        At step three, the ALJ found that Mr. Prince did not suffer from an impairment or combination

6    of impairments that either was listed in the regulations or was medically equivalent to one of the

7    listed impairments.  AR 31.

8        The ALJ then determined Mr. Prince's residual functional capacity ("RFC") in order to assess at

9    steps four and five whether he could perform his past relevant work or any other work considering

10   his age, education, and work experience.  The ALJ found that Mr. Prince had the following RFC:

11   1) the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; 2) the ability to

12   "sit, stand, walk (each) about six hours in an 8-hour day"; 3) the need to avoid concentrated

13   exposure to extreme cold, fumes, gas, dusts, odors, and poor ventilation; 4) the ability to perform

14   simple tasks consistent with SVP 2; 5) the ability to make simple work-related decisions with few

15   workplace changes; 6) the capacity for occasional interaction with coworkers and the public; and

16   7) the limitation of no overhead reaching with the right upper extremity.  AR 31-32.

17       In making this RFC finding, the ALJ considered the symptoms and how consistent they were

18   with the objective medical evidence (based on the requirements of 20 C.F.R. §§ 404.1529 and

19   416.929 and Social Security Rulings 96-4p and 96-7p).  AR 32.  He also considered opinion

20   evidence under 20 C.F.R. §§ 404.1527 and 416.1527 and Social Security Rulings 96-2p, 96-5p,

21   96-6p, and 06-3p.  AR 32.  The ALJ followed a two-step process, first determining whether there

22   was a medically-determinable physical or mental impairment that reasonably could be expected to

23   produce Mr. Prince's pain and symptoms, and then evaluating the intensity, persistence, and

24   limiting effects of the symptoms to determine the extent that they limited Mr. Prince's ability to do

25   basic work activities.  AR 32.  For the second part, whenever Mr. Prince's statements about the

26   intensity or functionally limiting effects of pain or other symptoms were not substantiated by

27   objective medical evidence, the ALJ made findings on the credibility of the statements based on

28   the "entire case record."  AR 32.

United States District Court
Northern District of California

13

The ALJ described Mr. Prince's testimony regarding his daily activities and the effect that his condition had on certain activities. AR 32. Specifically, Mr. Prince commented that his disabling condition has affected his ability to use his hands, get along with others, lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. AR 32. The ALJ opined that Mr. Prince "failed to quantify any such limitations or how those areas are affected. . ." AR 32. Even with respect to those areas where Mr. Prince quantified how the limitations affected him, such claims were not consistent with the medical evidence and his own testimony. AR 32. Consequently, the ALJ provided "little weight to the affected areas comments." AR 32.

The ALJ then described the "Function Report – Adult – Third Party" of Ms. Leianna Elicker, Mr. Prince's girlfriend. AR 33. In her report to the Social Security Administration, Ms. Elicker also commented on how Mr. Prince's condition affected his ability to do certain activities. *See* AR 32; AR 497. Similar to Mr. Prince's testimony, the ALJ provided little weight to Ms. Elicker's "affected areas comments" because she failed to quantify the limitations. AR 32.

In addition to the "affected areas comments", the ALJ indicated that Ms. Elicker submitted a statement that she believed Mr. Prince could not work. AR 33. With respect to this statement, the ALJ also provided it little weight because "she [meaning, Ms. Elicker] is not an acceptable medical source." AR 33.

After recounting Mr. Prince's testimony and Ms. Elicker's statement to the State Agency, the ALJ found that Mr. Prince's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found that his statements "concerning the intensity, persistence and limiting effects of these symptoms are credible to the extent that they are consistent with the above residual functional capacity assessment." AR 33. Ultimately, "the ALJ found that Mr. Prince's "subjective complaints are less than fully credible, and the objective evidence does not support the alleged severity of symptoms." AR 35.

In determining Mr. Prince's credibility, the ALJ explained that "[t]here is evidence that the claimant was not working for reasons that are not related to the allegedly disabling impairment(s)." AR 33. The ALJ pointed to Mr. Prince's answers in an HIV questionnaire, explaining that he tried to obtain work since becoming ill. AR 33. Despite his effort, Mr. Prince

14

1    explained that he was unable to secure work "due to his criminal history and lack of trade value."

2    AR 33.  The ALJ found that Mr. Prince's answer was significant.  *See* AR 33.

3        The ALJ determined that the medical evidence also did not support the severity of Mr. Prince's

4    alleged disabling conditions.  AR 33-34.  Even though Mr. Prince had HIV for 15 years, the ALJ

5    reasoned that he did not receive treatment until September 2008.  AR 33.  Moreover, the ALJ

6    explained that "[t]here is no opportunistic infection or neoplasia."  AR 33.  His medical records

7    only showed mild symptoms such as vomiting and diarrhea.  AR 33.  Rather, Mr. Prince is obese

8    with no significant weight loss or anemia as would be expected of someone with severe symptoms

9    from HIV.  AR 33.  Despite having a history of asthma, Mr. Prince continues to smoke.  AR 34.

10   He also continues to perform his daily chores and help care for his grandson.  AR 34.

11       In determining the RFC, the ALJ then described the relevant medical opinions and explained the

12   weight he provided each medical source.  AR 34-35.

13       First, the ALJ accorded great weight to Dr. Foster-Valdez's opinion.  AR 34.  Dr. Foster-Valdez

14   reported that Mr. Prince had the following limitations: 1) the ability to lift and carry 50 pounds

15   occasionally and 25 pounds frequently; 2) the ability to sit, stand, and walk for six hours in an 8-

16   hour day; and 3) the need to avoid concentrated exposures to fumes, odors, dusts, gases, and poor

17   ventilation.  AR 34.  In addition to these limitations, the ALJ "added a limitation of no overhead

18   reaching with the right upper extremity to account for his shoulder problems."  AR 34.

19       Second, the ALJ provided weight to Dr. El-Sokkary's opinion.  In finding that Dr. El-Sokkary's

20   opinion deserves weight, the ALJ explained that Dr. El-Sokkary is a specialist in the field of

21   psychology.  Moreover, Dr. El-Sokkary has administered many psychological and mental status

22   examinations on Mr. Prince.  AR 34.

23       Third, The ALJ accorded "[g]reat weight" to Dr. Seu's opinion.  AR 34 (citation omitted).  The

24   ALJ explained that such weight was appropriate because Dr. Seu examined Mr. Prince and "is a

25   board certified surgeon.  AR 34 (citation omitted).

26       Fourth, the ALJ provided the opinion little weight to Nurse Practitioner Euredis Chipendo.  In

27   so finding, the ALJ explained that Ms. Chipendo "is not an acceptable medical source."

28   Moreover, the ALJ opined that "her assessment of the claimant's ability to walk and stand 2-4

15

1    hours a day is not consistent with the physical findings and opinions" of Dr. Seu.  AR 34.  The

2    ALJ explained that Mr. Prince had "told Dr. Seu that he cleans his home, goes to his

3    appointments, and helps take care of a grandson."  AR 34 (citation omitted).

4       Fifth, the ALJ provided no weight to Dr. Bouvier's opinion.  AR 35.  Dr. Bouvier reported in

5    April 2011 that Mr. Prince was too debilitated by his medical conditions to maintain regular

6    employment.  AR 34.  Specifically, the symptoms relating to his condition: "anxiety, depression,

7    fatigue, insomnia, night sweats, respiratory problems, vomiting, and diarrhea."  AR 35.  These

8    conditions, Dr. Bouvier opined, have markedly affected Mr. Prince's daily activities.  AR 35.  In

9    particular, Mr. Prince's "unpredictable diarrhea" inhibits his ability to leave his home.  AR 35.

10   These symptoms, Dr. Bouvier, noted rendered Mr. Prince "incapable of maintaining sustained

11   concentration and focus, and make it difficult for him to interact with others, and respond

12   appropriately to supervisors and co-workers on a consistent basis."  AR 35.

13      In providing no weight to Dr. Bouvier's opinion, the ALJ explained that the opinion was

14   "inconsistent with the underlying progress notes" from the Center.  AR 35.  The ALJ expounded

15   that Ms. Raulet's April 2011 treatment note indicated that Mr. Prince had "ongoing HIV fatigue

16   and diarrhea that is controlled, viral load remains undetectable, and that he has no psychiatric

17   evaluation since jail 2007."  AR 35 (citation omitted).  In looking at a treatment note dated

18   February 2011, the ALJ found that Mr. Prince had not yet made an appointment with the

19   psychiatric clinic and "is putting it off."  AR 35 (citation omitted).

20      Sixth, the ALJ accorded "no weight" to Dr. Taylor's opinion, because "it is an attorney[-

21   ]referred evaluation that is not supported by the treatment notes of record or by the evaluation that

22   Dr. Taylor himself conducted."  AR 35.

23      Having determined Ms. Prince's RFC, the ALJ proceeded with steps four and five of the

24   sequential evaluative process.

25      At step four, the ALJ found that Mr. Prince was not capable of performing his past relevant

26   work.  AR 35.  As the VE had testified, the ALJ found that the Dictionary of Occupational Titles

27   ("DOT") classifies Mr. Prince's past relevant work as follows: 1) a case aide (DOT #195.367-010)

28   at SVP 3 with light strength; 2) electrical helper (DOT #829.684-022) at SVP 3 with medium and

16

1   heavy strength; 3) material handler (DOT #929.687-030) at SVP 3 with heavy strength; 4) cable

2   installation (DOT #821.281-010) at SVP 5 with heavy strength; and 5) general laborer (DOT

3   #922.687-058) at SVP 2 with medium strength.  AR 35-36.

4       At step five, the ALJ noted that Mr. Prince was a "younger individual" pursuant to 20 C.F.R.

5   §§ 404.1563 and 416.963.  AR 36.  The ALJ also indicated that transferability of skills was not a

6   material issue because the Medical-Vocational Rules supports a finding that Mr. Prince is not

7   disabled regardless if he has a transferable skill.  AR 36.  Pointing to the VE's testimony, the ALJ

8   found that Mr. Prince would be able to perform the following positions: 1) small products

9   assembler (DOT #706.684-022) with 1,800 positions regionally, and 280,000 nationally; 2)

10  recycling center weight tester (DOT #539.485-018) with 4,700 positions regionally, and 467,000

11  nationally; 3) patcher (DOT #723.687-010) with 1,800 positions regionally, and 280,000

12  nationally; and 4) nut sorter (DOT #521.687-086) with 4,700 positions regionally and 467,000

13  nationally.  AR 36-37.

14      The ALJ thus concluded that the Mr. Prince was not disabled, as defined in the Social Security

15  Act, at any time from February 1, 1992 through the date of the decision.  AR 37.

16                                          **ANALYSIS**

17      Mr. Prince challenges the ALJ's decision on two grounds: 1) the ALJ improperly "ignoring"

18  medical opinions; and 2) the ALJ erred by improperly rejecting Mr. Prince's testimony.  Pl.'s

19  Mot., ECF No. 25.

20  **I.  LEGAL STANDARD**

21      Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

22  Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may

23  set aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal

24  error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g);

25  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence

26  means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

27  reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d

28  1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's

United States District Court
Northern District of California

17

1    decision and a different outcome, the court must defer to the ALJ's decision and may not

2    substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir.

3    1999).

4    **A.  Applicable Law: Five Steps to Determine Disability**

5    An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

6    or mental impairment which can be expected to result in death or which has lasted or can be

7    expected to last for a continuous period of not less than twelve months," and (2) the "impairment

8    or impairments are of such severity that he is not only unable to do his previous work but cannot,

9    considering his age, education, and work experience, engage in any other kind of substantial

10   gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

11   The Social Security regulations set out a five-step sequential process for determining whether a

12   claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.

13   The five steps are as follows:

14   **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the

15   claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a

16   substantially gainful activity, then the claimant's case cannot be resolved at step one, and the

17   evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).

18   **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the

19   claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §

20   404.1520(a)(4)(ii).

21   **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments

22   described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the

23   claimant's impairment does not meet or equal one of the impairments listed in the regulations,

24   then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20

25   C.F.R. § 404.1520(a)(4)(iii).

26   **Step Four.**  Considering the claimant's RFC, is the claimant able to do any work that he or

27   she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.

28   If the claimant cannot do any work he or she did in the past, then the case cannot be resolved

United States District Court
Northern District of California

18

1    at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. §

2    404.1520(a)(4)(iv).

3    **Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the

4    claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and

5    entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other

6    work, the Commissioner must establish that there are a significant number of jobs in the

7    national economy that the claimant can do.  There are two ways for the Commissioner to show

8    other jobs in significant numbers in the national economy: (1) by the testimony of a vocational

9    expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart

10   P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

11   For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts

12   to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

13   **II.  APPLICATION**

14   **A.  ALJ Properly Rejected Mr. Prince's Testimony**

15       Mr. Prince contends that the ALJ's finding that he was "less than fully credible" is not

16   supported by specific, clear, and convincing reasons.  Pl.'s Mot., ECF No. 25 at 13-22.  The court

17   disagrees because the ALJ provided several reasons for finding that Mr. Prince was not fully

18   credible.

19       To determine whether a claimant's testimony about subjective pain or symptoms is credible,

20   the ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v.*

21   *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the

22   claimant has presented objective medical evidence of an underlying impairment that reasonably

23   could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at

24   1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ

25   can reject the claimant's testimony about the severity of his symptoms only by offering specific,

26   clear, and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony not

27   reliable, the ALJ must "specifically identify what testimony is credible and what testimony

28   undermines the claimant's complaints."  *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's

19

credibility determination if it is supported by substantial evidence in the record.  *See Thomas*, 278

F.3d at 959.

Here, the ALJ satisfied the first prong because it found that Mr. Prince's impairments could

reasonably cause some of the alleged symptoms.  *See* AR 33.  Under the second prong, the ALJ

did not state that Mr. Prince was malingering and found that Mr. Prince's statements about the

"intensity, persistence, and limiting effects of these symptoms" were credible to the extent that

they were consistent with his determination of the RFC.  *See* AR 33.  Because the ALJ did not find

that Mr. Prince was malingering, she may only reject Mr. Prince's testimony regarding his

symptoms by offering specific, clear, and convincing reasons.

In determining that Mr. Prince was not fully credible, the ALJ balanced Mr. Prince's testimony

about his abilities to care for himself and others against the following: 1) the medical evidence

does not support the severity of Mr. Prince's complaints; and 2) Mr. Prince's inconsistent

statements.  AR 32-33.  The ALJ's credibility findings are supported by the record as noted below

and by Ninth Circuit case law.

Mr. Prince contends that his daily activities do not undermine his credibility.  Pl.'s Mot., ECF

No. 25 at 19-20.  The ALJ noted Mr. Prince testified that "he took care of his cat, took care of his

personal grooming needs, prepared simple meals, made his bed, washed dishes, walked, used

public transportation, drove (albeit on his expired license), and shopped twice a month."  AR 32.

In addition to Mr. Prince's testimony, the ALJ noted that Mr. Prince told Dr. Seu that he helps

take care of his grandson.  AR 33.  The ALJ concluded that Mr. Prince's daily activities are not

consistent with a person with such disabling symptoms and conditions.  AR 33.  *See Fair v.*

*Bowen*, 885 F.2d 597 (9th Cir. 2007) (holding that the ALJ properly discredited claimant's

testimony of disabling pain based on several factors, including claimant's daily activities and

personal task).

Next, Mr. Prince argues that lack of support in objective medical evidence is legally

insufficient to discount his testimony.  Pl.'s Mot., ECF No. 25 at  17.  In her decision, the ALJ

explained that Mr. Prince's symptoms from his asthma and HIV did not appear to be as disabling

as he alleged.  AR 33-34.  With respect to Mr. Prince's asthma, the ALJ explained that he

20

1    continues to smoke despite his condition.  AR 34.  The ALJ then turned to Mr. Prince's HIV

2    treatment.  Even though Mr. Prince had been HIV-positive for 15 years, the ALJ opined that he

3    did not receive treatment until September 2008.  AR 33.  The ALJ further noted that Mr. Prince's

4    HIV is well controlled with undetectable viral loads.  AR 34.  The record also shows that Mr.

5    Prince only experienced mild symptoms and is obese with no significant weight loss or anemia as

6    would be expected of someone experiencing severe symptoms from HIV.  AR 33.  In determining

7    Mr. Prince's credibility, the ALJ also explained that "[t]here is no opportunistic infection or

8    neoplasia" due to his HIV positive status.  AR 33.  Although lack of objective medical evidence

9    supporting the degree of limitation cannot be the sole basis for discounting a claimant's testimony,

10   it is a factor that an ALJ may consider in assessing credibility.  *See Burch v. Barnhart,* 400 F.3d

11   676, 681 (9th Cir. 2005) (finding that "lack of objective medical evidence cannot form the sole

12   basis for discounting pain testimony," but that the ALJ may consider it in assessing the claimant's

13   credibility).

14        Another factor that the ALJ considered was inconsistency in Mr. Prince's statement.  AR 32.

15   The ALJ considered Mr. Prince's answer to an HIV questionnaire in determining that Mr. Prince

16   is not credible.  AR 33.  Specifically, Mr. Prince stated that the reason he is not working is due to

17   his criminal history and lack of trade value rather than his disabling conditions.  AR 33.   This is

18   contrary to Mr. Prince's testimony at the hearing that he is unable to work due to his impairments.

19   *See* AR 61-62.  The ALJ may consider such inconsistent statements.  *See Bradford v. Astrue*,

20   EDCV 07-1022-JTL, 2008 WL 2523833 (C.D. Cal. June 20, 2008) (holding that "ALJ properly

21   cited to the inconsistences in plaintiff's statements regarding the reasons she was unable to work"

22   as a factor for finding that plaintiff was not credible) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th

23   Cir. 1989)); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (noting that the ALJ may

24   consider ordinary techniques of credibility such as "prior inconsistent statements concerning the

25   symptoms, and other testimony by the claimant that appears less than candid").

26        Because the ALJ's credibility determination is supported by substantial evidence in the record,

27   the court defers to that determination.

28        **B.  ALJ Improperly a Medical Opinion**

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1   Mr. Prince challenges the ALJ's opinion for improperly "ignoring" two medical opinions: 1)

2   Dr. Taylor and 2) Dr. Foster-Valdez.  Pl's Mot., ECF No. 25 at 8.  When determining whether a

3   claimant is disabled, the ALJ must consider each medical opinion in the record together with the

4   rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010

5   WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social Security Administration

6   favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d

7   625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a treating physician is

8   given deference because 'he is employed to cure and has a greater opportunity to know and

9   observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595,

10   600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "However, the

11   opinion of the treating physician is not necessarily conclusive as to either the physical condition or

12   the ultimate issue of disability." *Id.* (citing *Magallanes*, 881 F.2d at 751 and *Rodriguez v. Bowen*,

13   876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

14    "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

15   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

16   case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. §

17   404.1527(d)(2)).  "If a treating physician's opinion is not given 'controlling weight' because it is

18   not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

19   [Social Security] Administration considers specified factors in determining the weight it will be

20   given." *Id.*  "Those factors include the '[l]ength of the treatment relationship and the frequency of

21   examination' by the treating physician; and the 'nature and extent of the treatment relationship'

22   between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

23   "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

24   treating physician, include the amount of relevant evidence that supports the opinion and the

25   quality of the explanation provided; the consistency of the medical opinion with the record as a

26   whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the

27   degree of understanding a physician has of the [Social Security] Administration's 'disability

28   programs and their evidentiary requirements' and the degree of his or her familiarity with other

22

United States District Court
Northern District of California

1    information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).  Nonetheless, even if

2    the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference.

3    *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)).  Indeed, "[i]n many cases, a treating

4    source's medical opinion will be entitled to the greatest weight and should be adopted, even if it

5    does not meet the test for controlling weight."  SSR 96-02p at 4 (Cum. Ed. 1996).

6        "Generally, the opinions of examining physicians are afforded more weight than those of non-

7    examining physicians, and the opinions of examining non-treating physicians are afforded less

8    weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. §

9    404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the

10   relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an

11   ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.

12   2008) (citing 20 C.F.R. § 404.1527).  "'To reject [the] uncontradicted opinion of a treating or

13   examining doctor, an ALJ must state clear and convincing reasons that are supported by

14   substantial evidence.'"  *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)

15   (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)) (emphasis added).  "'If a treating or

16   examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

17   by providing specific and legitimate reasons that are supported by substantial evidence.'"  *Id.*

18   (quoting *Bayliss*, 427 F.3d at 1216) (emphasis added).[4]  Opinions of non-examining doctors alone

19

20   _____

     [4]  Although the type of reasons needed to reject either a treating or an examining physician's
21   opinion is the same, the amount and quality of evidence in support of those reasons may be
     different.  As the Ninth Circuit explained in *Lester*:

22
         Of course, the type of evidence and reasons that would justify rejection of an
23       examining physician's opinion might not justify rejection of a treating physician's
         opinion.  While our cases apply the same legal standard in determining whether the
24       Commissioner properly rejected the opinion of examining and treating doctors—
         neither may be rejected without 'specific and legitimate' reasons supported by
25       substantial evidence in the record, and the uncontradicted opinion of either may
         only be rejected for 'clear and convincing' reasons—we have also recognized that
26       the opinions of treating physicians are entitled to greater deference than those of
         examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. §
27       404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an

28

                                                  23

ORDER 12-CV-05609-LB

cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

**1. Dr. Taylor's Opinion**

First, Mr. Prince contends that the ALJ erred by rejecting the opinion of Dr. Taylor, an examining physician.[5] Pl's Mot., ECF No. 25 at 8. The ALJ provided no weight to Dr. Taylor for the following reasons: 1) the opinion was an "attorney referred evaluation that is not supported by treatment notes of record or by the evaluation that Dr. Taylor himself conducted;" and 2) Mr. Prince has not received psychiatric treatment since 2007. To demonstrate that Dr. Taylor's opinion is not supported by the medical record or Dr. Taylor's own treatment notes, the ALJ provided an example. AR 35. She stated,

> For example, Dr. Taylor opined he had marked limitations in carrying out short simple instructions, maintaining concentration, attention and persistence, responding appropriately to changes in the work setting and completing a normal

---

examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

[5] Mr. Prince identifies Dr. Taylor as a treating physician in his motion for summary judgment. Pl's Mot., ECF No. 25 at 8. In the Commissioner's cross-motion, she identifies Dr. Taylor as an examining physician. "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). It does not appear that Mr. Prince was seen by Dr. Taylor for the purposes of treatment. Dr. Taylor's report indicates that Mr. Prince was referred by his counsel for a "psychological evaluation because he presents as being eligible for disability benefits." AR 945. Even though Mr. Prince was seen for two evaluation sessions, Dr. Taylor indicated that the "first evaluation session was used primarily to do a comprehensive mental status examination and pre test interview" and the second session "was used to administer psychological tests that were used for this evaluation." AR 945.

24

United States District Court
Northern District of California

1

2

3

workweek without interruption from psychological symptoms but the evaluation at
Exhibit 21F, p. 4 says he has an adequate long-term memory, is a reliable historian,
has some difficulty with his short term memory, his concentration was adequate,
and his attention and concentration was adequate throughout the evaluation, and he
actually was hypervigilant, with him paying attention to everything Dr. Taylor did
and said.

4

5

6

7

8

9

10

11

12

13

14

15

16

AR 35.  Despite noting that Mr. Prince's attention and concentration is adequate in his treatment

notes, Dr. Taylor concluded that Mr. Prince had a marked limitation in maintaining concentration,

attention and persistence.  This example demonstrated that Dr. Taylor's conclusion and his

treatment notes contradicted each other.  Thus, even though Mr. Prince's failure to seek continued

treatment for his psychological problems is not a sufficient basis to reject a medical opinion, the

ALJ provided other reasons that are supported by law.  *Connett v. Barnhart*, 340 F.3d 871, 874-75

(9th Cir. 2003) (holding that the ALJ properly rejected the opinion of a treating physician that was

inconsistent with his own treatment notes and other physicians' opinion); *Saelee v. Chater*, 94

F.3d 520, 522 (1996) (holding that the ALJ properly rejected treating physician's solicited report

as untrustworthy when "it was obtained solely for the purposes" of the hearing, varied from that

physician's own treatment notes, and "worded ambiguously in an apparent attempt" to help

claimant obtain benefits).

17

### 2.  Dr. Foster-Valdez's Opinion

18

19

20

21

22

23

Second, Mr. Prince contends that the ALJ stated that she provided great weight to the opinion

of Dr. Foster-Valdez, a non-examining physician, but the ALJ's RFC failed to reflect Dr. Foster-

Valdez's opinion, requiring a moderate limitation in "the ability to accept instructions and respond

appropriately to criticism from supervisors."  Pl's Mot., ECF No. 25 at 9-12; *see* AR 796.  Rather,

the ALJ's RFC only accounted for an occasional limitation with coworkers and the public.  AR

32, 34.

24

25

26

27

In the "Mental Residual Functional Assessment," Dr. Foster-Valdez checked boxes, indicating

that Mr. Prince had a moderate limitation in the following: 1) the ability to accept instructions and

respond appropriately to criticism from supervisors; 2) the ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; and 3) the ability to interact

appropriately with the general public.  AR 796.  Dr. Foster-Valdez further explained the functional

28

1    capacity assessment in the summary section.  She stated that the "Clmt's [meaning, Mr. Prince's]

2    ability to respond appropriately to supervisors, coworkers and work situations is limited per his

3    report, he would likely do best in setting w/ limited social contact."[6]  AR 797.  Despite providing

4    "great weight" to Dr. Foster-Valdez's opinion, the ALJ's RFC did not provide any limitation on

5    Mr. Prince's ability to respond appropriately to supervisors.[7]

6        Unlike Dr. Foster-Valdez, Dr. El-Sokkary, an examining physician, reported that Mr. Prince

7    "was cooperative throughout the evaluation and was capable of adequately communicating and

8    therefore would be able to appropriately interact with supervisors and co-workers at this time."

9    AR 768.  In her decision, the ALJ stated, "I give weight to Dr. Sokkary's opinion (except I gave a

10   limitation of occasional interaction with co-workers and the public)."  AR 34.  Consequently, the

11   ALJ rejected Dr. El-Sokkary's finding that Mr. Prince could communicate with co-workers.  AR

12   34.

13       The Commissioner argues that the ALJ did not err because 1) the ALJ "expressly accepted

14   only the restrictions for limited interactions with coworkers and the public from the reviewing

15   physician's evaluation [meaning, Dr. Foster-Valdez]" and 2) "substantial evidence existed" in Dr.

16   El-Sokkary's opinion to support the ALJ's RFC.  Comm'r's Opp'n and Cross-mot., ECF No. 28

17   at 3.  Despite the Commissioner's contention, the problem is that the ALJ did not provide an

18   explanation for why she only selected to adopt a portion of Dr. Foster-Valdez's opinion.  *See* AR

19   34 (noting that the RFC accounted for an occasional limitation with co-workers and the public).

20   At the same time, the ALJ rejected the other portion of Dr. Foster-Valdez's opinion regarding Mr.

21   Prince's ability to appropriately respond to his supervisors.  *See* Social Security Ruling 96-8p ("if

22

23   ――――――――――――――――

24   [6]  The court observes that the Commissioner, in her opposition, misinterpreted Dr. Foster-Valdez's
     statement as meaning that "Plaintiff *had the ability to respond* 'appropriately' to supervisors,

25   coworkers and work situations, and would likely do best in a setting with limited social contact."
     *See* Comm'r's Opp'n and Cross-mot., ECF No. 28 at 2 (emphasis added).

26   [7]  Dr. Foster-Valdez's statements were acknowledged by the ALJ.  AR 34.  Specifically, the ALJ

27   stated that Dr. Foster-Valdez concluded that Mr. Prince could "respond appropriately to
     supervisors, co-workers and work situations, with limited social contact, and deal with changes in

28   a routine work setting."  AR 34.

United States District Court
Northern District of California

United States District Court
Northern District of California

the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). To the extent that the ALJ found that Mr. Prince could interact appropriately with his supervisors based on Dr. El-Sokkary's opinion, the ALJ also did not provide a reason for why she only adopted this portion of his opinion and rejected Dr. Foster-Valdez's opinion in this regard. *See* AR 34. Even though an examining physician such as Dr. El-Sokkary is typically given more weight than a non-examining physician, the problem is that the two physicians' opinions conflicted and the ALJ did not explain why she adopted certain parts of one opinion over the other.

This statement regarding Mr. Prince's inability to appropriately respond to his supervisor is not inconsequential. The VE testified that a hypothetical including all the limitations listed in the ALJ's RFC combined with a moderate restriction on the ability to appropriately respond to supervisors would preclude Mr. Prince from being employed in any job. As such, the undersigned cannot say that this is a harmless error and therefore, remand for a proper inquiry into Mr. Prince's ability to interact with his supervisors, coworkers, and the public. *See Molina*, 674 F.3d at 1122. In light of the court's holding to remand, the ALJ is free to reconsider the weight given to the opinions of Drs. Foster-Valdez and El-Sokkary.[8]

## CONCLUSION

The court **GRANTS** Mr. Prince's motion for summary judgment and **DENIES** the Commissioner's cross-motion for summary judgment. The matter is remanded for further proceedings consistent with this order.

This disposes of ECF Nos. 25 and 28.

///

_____

[8] Here, the ALJ provided "great weight" to Dr. Foster-Valdez because her opinion is consistent with the medical record; however, the only opinion, other than Dr. Foster-Valdez's, that the ALJ accorded weigh to was Drs. El-Sokkary and Seu. *See* AR 34-35. Dr. Seu's report did not discuss Mr. Prince's ability to interact with the public, his coworkers, or supervisors, and Dr. El-Sokkary's opinion contradicted Dr. Foster-Valdez in this respect. *See* AR 861-64. Therefore, it is not clear to the court which medical record that the ALJ relied on to arrive at her conclusion. Because it is not clear to the court how the ALJ arrived at this conclusion, remand is proper to conduct a proper inquiry.

1      **IT IS SO ORDERED**.

2 Dated: September 25, 2013



3     LAUREL BEELER
    UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

28

ORDER 12-CV-05609-LB